Nos. 2--05--0778 & 2--05--0783 cons.

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 04--CF--205 |
| AUGUSTIN FLORES, | ) ) ) | Honorable Ann B. Jorgensen, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 04--CF--206 |
| LUIS G. FLORES, | ) ) ) | Honorable Ann B. Jorgensen, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE O'MALLEY delivered the opinion of the court:

The State appeals the judgment of the circuit court of Du Page County granting the motions of defendants Augustin Flores (case number 2--05--0778) and Luis Flores (case number 2--05--0783) to quash arrest and suppress evidence. We reverse and remand both cases.

Defendants were indicted for two counts of burglary (720 ILCS 5/19--1(a) (West 2004)) and one count of possession of burglary tools (720 ILCS 5/19--2 (West 2004)) in connection with two

alleged car stereo thefts. Arguing that they had been placed under arrest without probable cause, defendants filed motions to quash arrest and suppress evidence. The trial court held a combined evidentiary hearing on the motions on April 20, 2005.

At the hearing on the motion, defendants called Officer Kenneth Lafin, an Elmhurst police officer, to testify first. He testified that, on January 23, 2004, at approximately 4:30 a.m., he was patrolling the area around an apartment complex on north York Road in an unmarked sport-utility vehicle when he saw a car drive through the apartment complex parking lot. He was patrolling the area because the police department was "having numerous reports of cars being broken into not only in that actual apartment complex but up and down York Road." The vehicle went to two sides of the parking lot, passed an entrance, but did not leave the parking lot.

Lafin took up surveillance of the car, which left the parking lot after circling it more than once and traveled south on York Road for "five or six blocks" before pulling into a gas station. After one of the occupants got out of the vehicle and appeared to put gas in the vehicle, the car left the gas station and continued south on York Road for approximately 1 or 1½ miles. The car then turned right and stopped "maybe a car length away from the curb more towards the center of the street for six or seven seconds with its lights off before eventually backing into a parking spot along the railroad tracks parallel to [a nearby] apartment complex." On cross-examination, Lafin clarified that before backing into the parking spot, the car turned its lights off while rolling to a stop in a driving lane on the road. Though there was nothing illegal about the car parking in the spot, Lafin noted on re-cross-examination that the car's driving on the roadway without headlights was a moving violation. Though he had a police radio in his sport-utility vehicle, Lafin had not received any reports of any stolen car stereos that night.

Lafin pulled his sport-utility vehicle in front of the car, up to "possibly the front quarter panel [or] maybe up to the front passenger's side tire," but he left enough room--"probably seven or eight feet"--so that the car would have been able to drive away if it had turned its wheels while pulling out of the parking spot. His unmarked sport-utility vehicle had a "red and blue LED light" for effectuating stops, but Lafin did not activate it at that time. Lafin, who was wearing his full police uniform, exited his sport-utility vehicle and approached the driver's side window of the car. During his testimony, he identified the driver of the car as defendant Augustin Flores and the passenger as defendant Luis Flores.

Lafin asked the driver for his license and, at that point, he noticed that "the back seat of the car *** was folded down allowing access to the trunk." He could see "two car stereos with their wiring harnesses still coming out of the back of them lying on top of that folded down back seat." On cross-examination, Lafin stated that he did not see any boxes, instruction booklets, warranty cards, or other items that would normally accompany a car stereo purchased from a store.

After Augustin tendered his license, Lafin "had a conversation with him asking him why he was parked at this parking lot here at this time of the morning." Augustin told Lafin that he was waiting for a friend named Osvaldo who lived in the nearby apartment complex, but he was not sure of the exact address of his friend's apartment. He also told Lafin that he came from his home in Villa Park and had not made any stops between Villa Park and his parking spot. Lafin agreed that the car never actually stopped in the first parking lot, where Lafin's surveillance began. On cross-examination, Lafin agreed that both Augustin and Luis "kept putting [their] hands into [their] jacket pocket[s]," and he recalled that he had to tell defendants more than once to keep their hands out of their pockets.

After Augustin told Lafin that he had come directly from Villa Park, Lafin determined that Augustin had lied to him, and Lafin "asked him to exit the car so [he] could speak with him further." Lafin testified that "[he] said what [he] always say[s], [']why don't you do me a favor and come out of the car[?'] " When he made his request, Augustin "continually kept reaching down towards his pockets as if he was trying to hide something." When Lafin repeated the request, Augustin "began to lean over the center console like he was either reaching for something or hiding something." During some point in his observation of Augustin, Lafin noticed "what [he] thought to be the end of a screwdriver." On cross-examination, Lafin recalled that he was able to see what he thought looked like a screwdriver handle in Augustin's pocket when Lafin asked him to exit the vehicle. Lafin noted in his testimony that the screwdriver could be used as a weapon.

Lafin then "ordered him to show *** his hands and to exit his vehicle." Approximately 15 seconds elapsed between Lafin's initially asking Augustin to exit the vehicle and his ordering him to exit the vehicle. When he ordered Augustin out of the vehicle, Lafin was carrying a gun on his right hip, but he did not display it. When Augustin began to exit the car, Lafin called for backup "because of [Augustin's furtive] movements" and because he "had two subjects in the car and [he] was by [him]self." After a minute at the most, another police car arrived on the scene. Lafin asked Augustin to step to the rear of the car and place his hands on the trunk of the car. On cross-examination, Lafin stated that Augustin again started trying to put his hands in his pockets once he was out of the vehicle. He also recalled on cross-examination that the weather that night was cold.

At that point, Lafin "placed handcuffs on him and explained to him that his actions were being furtive and wanted to make sure he wasn't going for any weapons." Lafin "informed him that [he was] not under arrest[,] but for [Lafin's] safety," he placed him in handcuffs. Lafin did not recall if

he placed Augustin in handcuffs just before or just after the second officer arrived. When the second officer arrived, Lafin apprised him of the situation and instructed him to attend to Luis, who was still seated in the passenger seat of the car. Lafin did not recall what happened to Luis, because his attention was focused on Augustin.

Lafin also did not recall if he placed the handcuffs on Augustin before or after "check[ing] [him] for weapons," but Lafin did not find any weapons on Augustin's person. On cross-examination, Lafin testified that he asked Augustin where the screwdriver was, and Augustin denied ever having a screwdriver. Lafin asked for and obtained permission to search the car, but his testimony implies that the search was not conducted until after more officers arrived on the scene.

"Immediately" or "a minute or two" after checking Augustin for weapons and placing him in handcuffs, Lafin used his police radio to ask nearby officers to check the area for evidence of cars that may have been broken into. After another "minute or two," Lafin was notified by other officers on his radio that they had located "a vehicle with a broken out window glass slide on the ground next to the door and it appeared to be a stereo was removed." Lafin received this report after standing with defendant handcuffed for "[f]our or five minutes."

After Lafin received the report of the apparently burglarized nearby car, a squad car arrived on the scene, and Lafin placed Augustin, who was still handcuffed, inside the squad car. Augustin was later taken to the police station. On cross-examination, Lafin stated that he did not tell Augustin that he was under arrest until after Lafin was informed of the apparent burglaries that night, and that, in fact, he informed Augustin that he was not under arrest, but was instead "being detained as part of a burglary investigation" when he was initially placed in the squad car. The entire encounter, from

the time Lafin parked his car to the time Augustin was placed in the squad car, lasted "[s]even to ten minutes maybe."

Defendants next called Officer Kucera, an Elmhurst police officer, to testify. He testified that he responded to a call for assistance from Lafin at approximately 5:05 a.m. on January 23, 2004, while he was on patrol duty for the Elmhurst police department. When he arrived at the parking lot described in Lafin's testimony, two people were still in the car, and Lafin directed him to the passenger of the vehicle. Kucera opened the passenger-side door and asked the passenger, whom he identified at the hearing as Luis, to "step out right away" or "step out immediately," because Lafin told him that Luis had been putting his hand in his pocket. Kucera testified that he then talked to Luis before asking for consent to search him, which Luis granted. Kucera later testified that he "immediately" asked Luis for consent to search. After Kucera discovered a flashlight and a screwdriver in Luis's pocket during the search, he advised Luis of his rights under Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), and then talked with him further. Approximately 1 or 1½ minutes passed between Kucera's ordering Luis out of the car and his "Mirandizing" him. At the time, Kucera was aware of "prior burglaries on the north side of town," but he did not know of any that night before he spoke with Luis. He "Mirandized" Luis because "there were stereos in the car and there were objects such as a screwdriver and a flashlight in his pocket." On cross-examination, Kucera stated that, based on his experience as a police officer, flashlights and screwdrivers could be used to pry stereos out of cars. He had no conversation "of substance" with Lafin at the scene, because each of them was dealing independently with Augustin and Luis.

Kucera and Luis spoke for approximately five minutes before Luis admitted that defendants had committed "some burglaries" and that "he was willing to show [Kucera] where they had broken into some cars." Kucera then placed Luis in handcuffs and put him in a squad car. The police transported Luis to another location, where he showed them where defendants had broken into a vehicle. Luis also pointed out a second location where they had broken into a vehicle. He was then taken to the police station.

After a recess and after hearing argument, the trial court ruled as follows, in pertinent part: "I listened to the testimony of the police officers this morning and I think they were candid and sometimes there is a fine line between extraordinary police work and no probable cause for an arrest.

*** [After the events Lafin described seeing in his initial surveillance of the car,] [t]he car turns off on a residential street, turns. It [sic] lights are on [sic] again. That's odd but it's not probable cause, backs into a parking spot, and waits 15 seconds. Nothing happens so the police officer approaches. Now much ado about how much of the car he blocked or didn't block in. If he didn't mean to intimidate or impose himself on the defendants' vehicle, he also could have parked completely away from this defendant's vehicle but he didn't. He pulled in and blocked at least by conservative estimates the first quarter of the defendant's car and if he had moved and twisted and turned, he could have pulled away. The officer approaches the driver, sees the stereo in the back seat but interestingly of all the questions the police officer asked he never asked him where did you get the stereos? Are you in that business? ***

Much ado about moving hands into the pockets. It's cold. Any time a police officer has a genuine concern for his safety absolutely all steps should be taken to ensure that the proposed offenders in the vehicle are not armed and I'll even go so far to say, well, you could have asked the driver to get out of the car and then patted him down. But to then cuff him, put him at the back of the car, and leave him cuffed after there was absolutely no danger of the [defendants] being armed, I think speaks volumes that these defendants were under arrest. They were in custody well before Officer Lafin had any confirmation of [the burglaries]. One of the few questions that wasn't asked here today was point blank did you know before or after various events happened that there was in fact a burglary to a vehicle? ***

But I could conclude based on what reading between the lines that they didn't know it until *** well after the driver was out of the car and cuffed and remained cuffed. He was placed into the back of the squad car. Now, if that's not under arrest and in custody I don't know what is. So for those reasons, the motion to quash arrest with respect to the driver is granted.

Now with respect to the passenger, again the car in which he was driving is blocked in even albeit just the quarter of the way nonetheless the police officer had the entire stretch of the road to pull up his [sport-utility vehicle] and he chooses to go right in front of the defendant's car. I could conclude again no other reason that he wished to make his presence known to the occupants of that car. When the passenger is asked to get out of the car, he is patted down. That officer is satisfied that there is no further danger, doesn't cuff him, doesn't ask him to step to the back of the car, front of the car. He begins then to I think start the process that would be indicia of custody particularly he gives him his Miranda warnings and

then begins to ask him questions about the stereo. Again, that to me indicates they were under arrest and at that time there was no indication at all that any other burglary had been committed, at least none had been communicated to either one of those police officers.

So for those reasons ***, the motion to quash with respect to the passenger is also granted."

The trial court denied the State's motions to reconsider, and the State filed certificates of impairment and notices of appeal pursuant to Supreme Court Rule 604(a)(1). 188 Ill. 2d R. 604(a)(1).

On appeal, the State argues that the trial court committed reversible error in granting defendants' motions to quash, because the officers' actions in this case did not violate defendants' rights under the fourth amendment. The trial court is in a superior position to determine and weigh the credibility of witnesses, observe the witnesses' demeanor, and resolve conflicts in the witnesses' testimony. People v. Sorenson, 196 Ill. 2d 425, 431 (2001). Therefore, a reviewing court must accord great deference to the trial court's factual findings, and such findings should be reversed only when against the manifest weight of the evidence. Sorenson, 196 Ill. 2d at 431. A challenge to the trial court's ultimate legal conclusion based on those facts, on the other hand, presents a question of law and should be reviewed de novo. Sorenson, 196 Ill. 2d at 431.

The fourth amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV; accord Ill. Const. 1970, art. I, §6; see Fink v. Ryan, 174 Ill. 2d 302, 314 (1996) (the supreme court has construed the search-and-seizure language of the Illinois Constitution in a manner consistent with the Supreme Court's fourth amendment jurisprudence); see also People

v. Caballes, 221 Ill. 2d 282, 288-317 (2006) (reaffirming "limited lockstep" doctrine). It is well settled that not every encounter between the police and a private citizen results in a seizure. People v. Luedemann, 222 Ill. 2d 530, 544 (2006), citing Immigration & Naturalization Service v. Delgado, 466 U.S. 210, 215, 80 L. Ed. 2d 247, 254, 104 S. Ct. 1758, 1762 (1984), and People v. White, 221 Ill. 2d 1, 21 (2006). Courts have divided police-citizen encounters into three tiers: (1) arrests, which, in order to be considered reasonable, must be supported by probable cause; (2) brief investigative detentions, or "Terry stops," which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) encounters that involve no coercion or detention and thus do not implicate fourth amendment interests. Luedemann, 222 Ill. 2d at 544, citing United States v. Black, 675 F.2d 129, 133 (7th Cir.1982), and United States v. Berry, 670 F.2d 583, 591 (5th Cir.1982).

The State argues that the officers' actions in seizing defendants were reasonable, either as Terry stops supported by reasonable suspicion or as arrests supported by probable cause. We consider the reasonableness of each defendant's seizure in turn, and we begin with Augustin's case. As noted above, the trial court held that Augustin was arrested at the latest when he remained cuffed after Lafin searched him for weapons. Though the trial court did not so state, it implicitly held that Lafin lacked probable cause to arrest Augustin at that point in the encounter.

At the outset, we note that, when it made its oral ruling that Lafin's actions were unreasonable, the trial court placed substantial emphasis on the location of Lafin's sport-utility vehicle when he first approached Augustin's car. The court apparently held that the location of Lafin's vehicle was a show of force indicative of a seizure but that at that time Lafin lacked probable cause that Augustin had committed a burglary. However, Lafin's testimony that he saw the car commit a moving violation was uncontroverted, the trial court specifically stated that Lafin's testimony was

credible, and the trial court appeared in its oral ruling to reference defendants' deactivating the lights of their car. Accordingly, we may conclude for purposes of review that the car turned its lights off while still in a driving lane. This act was a moving violation under the Illinois Vehicle Code (see 625 ILCS 5/12--201 (West 2004)), which, of course, may justify a seizure (People v. Gonzalez, 204 Ill. 2d 220, 227-28 (2003)). This holds true even if Lafin's subjective grounds for the seizure were the stereo thefts and not the traffic violation. See Whren v. United States, 517 U.S. 806, 813, 135 L. Ed. 2d 89, 98, 116 S. Ct. 1769, 1774 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"); People v. Thompson, 283 Ill. App. 3d 796, 798 (1996). Therefore, Augustin could have been rightfully seized from the point he committed the traffic violation, and the fact that Lafin's car may have blocked him is of no moment to this case.[1]

Likewise, Lafin's approaching the car and asking for Augustin's driver's license was reasonable, especially in light of the fact that he had observed the car committing a moving violation. After he obtained Augustin's license and began a conversation with him, Lafin saw two car stereos, with their wiring harnesses hanging out and without any packaging, sitting in plain view on the

---

[1]In Atwater v. City of Lago Vista, 532 U.S. 318, 149 L. Ed. 2d 549, 121 S. Ct. 1536 (2001), the United States Supreme Court held that probable cause for a traffic offense justifies an arrest. However, in People v. Moorman, No. 2--04--1212 (November 29, 2006), relying primarily on our own supreme court's decision in People v. Jones, 215 Ill. 2d 261 (2005), this court determined that in Illinois a valid arrest requires probable cause "for something more than a traffic violation." Moorman, slip op. at 14. Because neither party raises the issue of a traffic violation justifying the arrests, and because we find the arrests justified on other grounds, we do not address this issue further.

backseat of the car. That knowledge, combined with his knowledge that the area had been the site of several recent car stereo thefts, the fact that Augustin lied to him about his prior activities that night, and the fact that Augustin was behaving suspiciously in the area, provided Lafin ample evidence to form at least reasonable suspicion that Augustin had been involved in car stereo thefts. Accordingly, he was justified in continuing the investigation and asking Augustin to step out of the car to discuss matters further.

At that point, the testimony indicated, Augustin began making furtive movements. The trial court downplayed the relevance of Augustin's furtive movements by noting that Augustin might be expected to place his hands in his pockets given the cold weather, but the court apparently accepted the testimony that Augustin made the furtive movements, even if it found them sufficient to justify only a pat-down search but not handcuffing. The testimony also indicated that Lafin was able to see the handle of a screwdriver in Augustin's pocket or near his person. At that point, Lafin obtained further facts to support his belief that Augustin had been involved in a crime.

Lafin also obtained reason to believe that Augustin might be armed. Indeed, as he noted in his testimony, the screwdriver itself could have been used as a weapon. As such, Lafin's search of defendant for a weapon was justified. See Sorenson, 196 Ill. 2d at 432 ("Terry further held that when an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others, the officer may conduct a pat-down search to determine whether the person is in fact carrying a weapon"), citing Minnesota v. Dickerson, 508 U.S. 366, 373, 124 L. Ed. 2d 334, 344, 113 S. Ct. 2130, 2136 (1993), and Terry, 392 U.S. at 24, 20 L. Ed. 2d at 908, 88 S. Ct. at 1881.

In response to Augustin's movements, Lafin ordered him out of the car, and, after further furtive movements, Lafin handcuffed him and searched him for weapons. After his search, and apparently after another officer had arrived on the scene to deal with Luis, Lafin kept Augustin in handcuffs and later placed him in a police squad car. It is the reasonableness of this portion of the encounter that both the State and Augustin most vigorously contest.

Though neither side cites the case, our supreme court's decision in People v. Gabbard, 78 Ill. 2d 88 (1979), may decide the issue of whether the seizure amounted to an arrest when Augustin remained handcuffed and was placed in a police squad car after Lafin determined he was carrying no weapons, or, arguably, when Lafin initially handcuffed Augustin. In Gabbard, a police officer observed the defendant walking south on the shoulder of a highway, pulled his car over to the shoulder, and came up behind the defendant. Gabbard, 78 Ill. 2d at 91. The defendant then walked back to the police car, opened the passenger-side door, and got in. Gabbard, 78 Ill. 2d at 91. The officer asked the defendant where he was going and whether he had any identification. Gabbard, 78 Ill. 2d at 91. The defendant stated that the only identification he had was a checkbook, and the checkbook he produced from his backpack contained blank checks with his name on them. Gabbard, 78 Ill. 2d at 91. While the defendant displayed the checkbook, the officer noticed stuck in the checkbook a piece of paper that appeared to be an Illinois driver's license. Gabbard, 78 Ill. 2d at 91. The officer asked the defendant if he had any further identification, and the defendant replied that he did not. Gabbard, 78 Ill. 2d at 91. The officer then ordered the defendant to place his head on the dash, and the officer drew his weapon and handcuffed the defendant. Gabbard, 78 Ill. 2d at 91. The officer later discovered incriminating evidence in defendant's backpack. Gabbard, 78 Ill. 2d at 91-92. The supreme court began its analysis of the case as follows:

"The defendant contends that [the officer's] questioning of him was itself restraint, which, under [Terry,] *** must meet a test of reasonableness, and that it failed to do so. We find it unnecessary to consider that contention, for the articles in question were not seized from the defendant until after he had been handcuffed. Although [the officer] did not then tell the defendant that he was under arrest, the State admits that his handcuffing constituted an arrest, and we agree. See Dunaway v. New York (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248." Gabbard, 78 Ill. 2d at 91-92.

See also People v. Eyler, 132 Ill. App. 3d 792, 803 (1985) (citing Gabbard and finding that "[a]n important feature of the defendant's detention [that helped elevate it to an arrest] was handcuffing"). But see People v. Vena, 122 Ill. App. 3d 154 (1984) (no arrest where the defendant was handcuffed, placed in squad car, and driven to police station). Gabbard, which was released in 1979, predates what Professor LaFave has termed a " 'multifaceted expansion of Terry,' especially a 'trend granting officers greater latitude in using force in order to "neutralize" potentially dangerous suspects during an investigatory detention.' " 4 W. LaFave, Search & Seizure §9.2(d), at 305 (4th ed. 2004), quoting United States v. Perdue, 8 F.3d 1455, 1464 (10th Cir. 1993). Given this evolution of the law surrounding Terry, the continued viability of reading the supreme court's holding to be that handcuffing per se constitutes arrest--if the court indeed intended such a broad reading in Gabbard-- may be the subject of some question. See also People v. Waddell, 190 Ill. App. 3d 914, 927 (1989) ("the facts in Gabbard clearly show more than mere handcuffing in reasonable response to a perceived threat"). An approach that considers the reasonableness of the handcuffing in light of the circumstances, and permits it within the auspices of Terry under appropriate circumstances, certainly comports with the sui generis nature of fourth amendment jurisprudence. See People v. Walters, 256

Ill. App. 3d 231, 236-37(1994) (citing cases for the proposition that "not all circumstances of handcuffing and detention convert a lawful Terry stop into a formal arrest"); Waddell, 190 Ill. App. 3d at 926-28 (discussing question of whether handcuffing constitutes an arrest and determining that the question hinges on the reasonableness of the officer's actions); cf. 4 W. LaFave, Search & Seizure §9.2(d), at 311-13 nn. 107-11 (4th ed. 2004) (discussing cases holding handcuffing did not convert a stop to an arrest and also cases holding the opposite, both based on the unique totality of circumstances presented).

However, all of that said, we need not reach the issue of precisely when Augustin's seizure became an arrest instead of a Terry stop or the issue of the proper interpretation of Gabbard, because we determine that, even if Augustin was under arrest when he was handcuffed and placed in a police squad car, such an arrest did not violate Augustin's fourth amendment rights. As noted above, in order to make a constitutionally valid warrantless arrest, a police officer must have probable cause to effect the arrest. People v. Love, 199 Ill. 2d 269, 278 (2002). Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime. Love, 199 Ill. 2d at 279. The existence of probable cause depends upon the totality of the circumstances at the time of the arrest. Love, 199 Ill. 2d at 279. " 'The standard for determining whether probable cause to conduct a warrantless arrest is present is probability of criminal activity, rather than proof beyond a reasonable doubt. [Citations.]' " People v. Garvin, 219 Ill. 2d 104, 115 (2006), quoting People v. Lee, 214 Ill. 2d 476, 485 (2005). Indeed, probable cause does not even demand a showing that the belief that the suspect has committed a crime be more likely true than false. People v. Jones, 215 Ill. 2d 261, 277 (2005), quoting Texas v. Brown, 460 U.S. 730, 742, 75 L. Ed. 2d 502, 514, 103 S. Ct. 1535, 1543

(1983). Where the question is whether a crime has been committed, as opposed to whether a particular individual committed a known crime, more evidence will be required to satisfy the probable cause requirement. In re D.G., 144 Ill. 2d 404, 410 (1991).

In the current case, we hold that the facts known to Lafin at the time he conducted his frisk for weapons are sufficient to have led a reasonably cautious person to believe that Augustin had committed a crime. At that time, Lafin knew that there had been several car stereo thefts in the immediate area, that defendants were driving suspiciously around a parking lot at a late hour, that stereos with loose wiring harnesses and no documentation were in defendants' backseat, that Augustin had lied to him regarding his activities that night, that defendants had exhibited furtive movements, that Augustin had a screwdriver (which is a tool used for car stereo theft), and that Augustin tried to conceal the screwdriver from Lafin. See generally 4 W. LaFave, Search & Seizure §3.6(a), at 306-09 (4th ed. 2004) (nature of property and circumstances surrounding its possession--such as the time of night, fact that the property is of a type often stolen, or fact that the property was not arranged in a way consistent with personal belongings in a vehicle--along with efforts to conceal objects from police or inadequate explanation from the subject concerning his activities--all support finding of probable cause).

We find the holding in People v. Jarrell, 248 Ill. App. 3d 1043 (1993), to be instructive in this case. There, officers were patrolling an industrial area where a rash of burglaries had been reported. At 1:40 in the morning, they observed the defendant carrying a long brass bar and walking away from a fence surrounding a building. Jarrell, 248 Ill. App. 3d at 1045-46. A portion of the fence had been peeled back and was being held open by clamps. Jarrell, 248 Ill. App. 3d at 1046. The defendant walked toward a parked car with its hood up, and, when he saw the officers, he dropped the brass

bar. Jarrell, 248 Ill. App. 3d at 1046. The officers approached the car and saw several brass bars lying in plain view in the rear seat area, and, after questioning the defendant and another defendant who had been waiting by the car, the officers noticed "some buckets of tools and clamps" in a weeded area "10 to 20 feet from the car." Jarrell, 248 Ill. App. 3d at 1046. The officers asked the two defendants what they were doing, and they responded that they had just come from a friend's house nearby. Jarrell, 248 Ill. App. 3d at 1046. However, when the officers proceeded to the house to verify the defendants' story, nobody answered the door. Jarrell, 248 Ill. App. 3d at 1046. The officers then arrested the defendants. Jarrell, 248 Ill. App. 3d at 1046.

On appeal, the defendants argued that the police lacked probable cause to arrest. Jarrell, 248 Ill. App. 3d at 1049. The appellate court disagreed. It reasoned that, at the time the defendants were arrested, the officers knew there had been a rash of burglaries in the area, they observed the car parked across the street from the hole in the fence, they saw one of the defendants walking away from the fence and carrying a brass bar, they saw the defendant drop the brass bar upon learning of their presence, they saw additional brass bars in the defendants' car, and they saw buckets of tools and clamps lying nearby. Jarrell, 248 Ill. App. 3d at 1049-50. The court also observed that the officers noticed that the hole in the fence was being held open by clamps and that nobody answered the door at the home where the defendants claimed to have come from. Jarrell, 248 Ill. App. 3d at 1050. The court concluded that, based on those facts, a reasonable person would have concluded that the defendants were committing burglary, and thus the officers had probable cause to arrest. Jarrell, 248 Ill. App. 3d at 1050. The court rejected the defendants' argument that the officers must have lacked probable cause because they had not verified that an actual burglary had taken place before the defendants were arrested. Jarrell, 248 Ill. App. 3d at 1050.

The current case contains many parallels to Jarrell. Lafin was on patrol in an area in which a rash of car stereo thefts had been reported, and he spotted Augustin driving in a suspicious manner late at night. When he approached Augustin's car, he saw suspicious items in Augustin's backseat, and, upon further investigation, he discovered that Augustin had burglary tools within his possession. He noted that Augustin's explanation for his presence was false. Also, just as in Jarrell, Augustin acted suspiciously after noticing the presence of an officer; in Jarrell, the defendant dropped the item he was allegedly stealing, while, here, Augustin made furtive movements and attempted to conceal the screwdriver he had within his possession. Further, compared to the brass bars the officer noticed in Jarrell, the car stereos with their wiring harnesses hanging out found in the back of Augustin's car are far more inherently suspicious and also more specifically consistent with the nature of the crimes that had generally been reported in the area. In short, Jarrell supports our conclusion that Lafin had probable cause to arrest Augustin.

Augustin's sole argument on the probable cause issue is that neither officer "kn[e]w that a burglary had been committed and reasonably believed that [Augustin] had committed that burglary." Thus, Augustin appears to argue that the officers cannot have had probable cause absent a verification that a burglary had actually taken place that night. However, as noted above, the standard for probable cause requires only that the officer have reasonable grounds to believe that a person has committed an offense. Lafin had such reasonable grounds, even before he received confirmation from the other officers who found the broken-into cars in the area. See Jarrell, 248 Ill. App. 3d at 1050 (rejecting contention that police lacked probable cause because they had not verified that a crime had taken place); 2 W. LaFave, Search & Seizure §3.6(a), at 306 (4th ed. 2004) ("An arrest for burglary *** is not rendered illegal by 'the mere fact that, at the time the [arrest] occurred, the officer was

unaware of any specific burglary' "), quoting People v. DeVito, 353 N.Y.S. 2d 990, 995, 77 Misc. 2d 463, 467 (1974).

We hold that, at the time he handcuffed Augustin, Lafin had probable cause to believe that Augustin had been involved in car-stereo thefts that night.

Turning to Luis's appeal, even assuming Luis was under arrest at the moment he was "Mirandized," based on the above discussion, we have little difficulty concluding that Kucera had probable cause to arrest Luis at the time he "Mirandized" him. Kucera, like Lafin, was aware of the outbreak of car-stereo thefts in the area, the late hour, and the stereos in the back of defendants' car. Kucera also saw that Luis was in possession of not only a screwdriver, but also a flashlight. Further, he was aware of defendants' furtive movements by virtue of Lafin's warning upon his arrival at the scene.

For the foregoing reasons, we reverse the judgments of the circuit court of Du Page County granting defendants' motions to suppress, and we remand for further proceedings consistent with this opinion.

No. 2--05--0778, Reversed and remanded.

No. 2--05--0783, Reversed and remanded.

GROMETER, P.J., and HUTCHINSON, J., concur.