Fourth Division
August 23, 2007

No. 1-05-1087

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 00 CR 1274 |
| | ) | |
| MARTIN CSASZAR, | ) | Honorable |
| | ) | Catherine M. Haberkorn, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE NEVILLE delivered the opinion of the court:

After a jury trial in April 2001, the defendant, Martin Csaszar, was convicted of solicitation of murder for hire and two counts of solicitation of murder, but he was acquitted of one count of solicitation of murder for hire. Following a hearing on his motion for a new trial, the trial court granted Csaszar a new trial. At the conclusion of his second trial in 2004, Csaszar was convicted of one count of solicitation of murder for hire and two counts of solicitation of murder. The trial court sentenced Csaszar to a term of 30 years of imprisonment for the conviction of solicitation of murder for hire, and to two 20-year terms of imprisonment for his convictions of solicitation of murder, with the sentences running concurrently. On appeal, Csaszar presents four issues for our review: (1) whether the trial court erred when, after performing an *in camera* inspection of the State's informant documents, it decided not to disclose the redacted portions of the documents to the defense; (2) whether the trial judge's comments reflect that she considered inapplicable aggravating factors, such

-1-

that he is entitled to a new sentencing hearing; (3) whether one of his convictions for solicitation of murder must be vacated because it violates the one-act, one-crime doctrine; and (4) whether the compulsory extraction of his blood and the perpetual storing of his DNA profile, pursuant to section 5-4-3 of the Unified Code of Corrections (730 ILCS 5/5-4-3)(West 1998)), violates his fourth amendment right to be free from unreasonable searches and seizures.

BACKGROUND

The First Trial

Martin Csaszar was charged by indictment with two counts of solicitation of murder for hire (720 IILCS 5/8-1.2)(West 2002)) and two counts of solicitation of murder (720 ILCS 5/8-1.1)(West 2002)) for allegedly soliciting an undercover Department of Alcohol, Tobacco and Firearms (ATF) agent named Mark Shaffer and an ATF confidential informant named James Anderson to kill Csaszar's former employer, Monica Crisan. Prior to and during Csaszar's jury trial, it was disclosed that Anderson, who was one of the State's principal witnesses, had been paid approximately $500 by ATF for his services in Csaszar's case. On April 2, 2001, the jury found Csaszar guilty of the solicitation of murder for hire with respect to Agent Shaffer but acquitted him on the corresponding count with respect to Anderson. Csaszar was found guilty of solicitation of murder with respect to both Agent Shaffer and Anderson. Following the jury's finding of guilt, Csaszar retained new counsel to litigate his motion for a new trial. After discovery and an evidentiary hearing, the trial judge ordered a new trial based on the State's failure to disclose to the defense the full extent of the ATF's financial dealings with James Anderson in violation of Brady v. Maryland, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963).

## The Second Trial

Prior to the second trial, Csaszar's counsel issued a subpoena *duces tecum* to the ATF on September 21, 2001, and requested those documents that were concerned with the ATF's association with James Anderson. The ATF responded to the subpoena by tendering a copy of Anderson's contract, a list of payments made to Anderson, and a number of other documents, all of which had been redacted with the exception of the contract. Defense counsel objected to the redactions, and the trial court reviewed the unredacted documents *in camera* on November 9, 2001. After inspecting the documents, the court concluded that none of the redacted information would aid defense counsel in defending their client and that counsel already had all the relevant, material information contained in the documents. The court further stated that the redacted information concerned whether the information Anderson provided would be used by the ATF or concerned Anderson's involvement in cases that were not related to Csaszar's case. The court declined to order the ATF to tender the unredacted documents to defense counsel.

Before the start of the new trial, the ATF tendered additional, previously undisclosed documents to defense counsel pertaining to ATF's dealings with Anderson. Those documents also contained redactions. The court conducted a second *in camera* inspection with respect to the second set of redacted documents and, after reviewing them, turned over some, but not all, of the documents without redactions.

## The Bench Trial

On July 12, 2004, Csaszar's second trial began. Below is a summary of the testimony that is relevant to the issues presented in this appeal.

The State's Case

Monica Crisan

Monica Crisan testified that she and her husband owned a trucking company, Livdimon Enterprise Corporation. She stated that she knew Csaszar because he worked for her uncle as a truck driver. Crisan testified that Csaszar was dissatisfied working for her uncle, and when she learned about this, she offered him a job working for her. Csaszar accepted the job offer. Crisan stated that in April of 1998, Csaszar quit huuis job with the Crisans because he wanted to go into business with his father. After quitting his job, Csaszar arranged to pick up his final paycheck two weeks later at Crisan's house. Crisan testified that prior to Csaszar's collecting his check, her husband told him to expect a deduction for some damage to one of the trucks. Crisan testified that Csaszar indicated that the deduction was fine with him.

Crisan testified that on May 3, 1998, Csaszar went to her home to pick up his paycheck and he was let into the kitchen, where her daughter was eating. Crisan testified that when she asked Csaszar to sit down, he complied but shoved the table roughly as he did so. Crisan told her daughter to finish eating in the living room. According to Crisan, when she explained to Csaszar that his final paycheck would include three deductions --- for a cash advance, for a workman's compensation claim, and for damage to a truck --- he became very upset, said he needed more money, pulled out a small gun, and pointed it at her. Crisan testified that after hearing a click and seeing Csaszar pull the trigger, she became scared and looked for the phone. Crisan testified that Csaszar told her that she would be dead by the time police arrived. Crisan testified that Csaszar then heard some noise coming from the porch stairs and ran out of the house. Crisan testified that she reported the incident to police

and eventually learned that Csaszar had been arrested.

On May 5, 1998, Csaszar was arrested and charged with aggravated assault and carrying/possessing a firearm in connection with the offense. Crisan was notified by mail that she would be a witness in the case, and she went to court on several occasions where she saw Csaszar. On the next scheduled court date, December 17, 1999, police informed her that Csaszar had tried to hire someone to kill her.

### James Anderson

James Anderson testified that he was a 74-year-old musician and was the former superintendent of the Chicago Housing Authority. He had worked as a confidential informant for the ATF for approximately 20 years. He also worked as a security guard at Jakacki Bag and Barrel, a company on the west side of Chicago. Anderson testified that in January 1999, he met Csaszar, who also worked at Jakacki as a truck driver. Anderson stated that in the summer of 1999, Csaszar began talking to him about Crisan and told him that she owed him a lot of money. Anderson later testified that Csaszar first spoke to him about Crisan in late November 1999. According to Anderson, Csaszar spoke about Crisan for two or three months but it became worse in November and December of 1999. Anderson testified that Csaszar told him every day that he wanted Crisan killed because she owed him money, because she was trying to put him in jail, and because he feared going to jail if she testified. Anderson testified that Csaszar asked him to kill Crisan. Anderson testified that he refused. Anderson testified that he told Csaszar that he did not kill people and that it was "not his cup of tea." Anderson stated that Csaszar told him to find someone who would kill Crisan and he would pay $500.

Anderson testified that on December 15, 1999, Csaszar gave him a piece of paper with a hand-drawn map on one side and on the other side Crisan's name, address, and phone number. At 6:45 p.m., on December 15, 1999, Anderson received a page from Csaszar, who was in Ohio. Anderson testified that later that evening, Anderson called ATF Agent Steven Brezette, whom he had worked with for five or six years. Anderson testified that he reported Csaszar's desire to have Crisan killed once he realized Csaszar was serious. Anderson testified that the following morning, December 16, 1999, he and Brezette went to the Cook County State's Attorney's office, where a consensual overhear order was obtained. Later that day, Anderson spoke with Csaszar three times by phone, and each conversation was recorded. Following these conversations, Anderson and ATF Agent Mark Shaffer, who was posing as a hit man, drove to Jakacki Bag and Barrel to meet Csaszar. Anderson testified that once they arrived, Csaszar got into the car with him and Agent Shaffer and the three men's conversation was recorded on audio and videotape.

Anderson acknowledged that between 1991 and 2002, he had been paid $17,180 in cash by the ATF and that he received $4,025 in connection with the Csaszar case, including a $3,500 reward. Anderson also testified that he received rewards from ATF in those cases which are not lost, which are settled "properly," and where the defendant is found guilty.

Audiotapes and Videotape Summaries

The State introduced into evidence audiotapes of the three telephone conversations between Anderson and Csaszar and the videotape of the meeting between Csaszar, Anderson, and Agent Shaffer. Anderson began the first phone conversation by informing Csaszar, "I have got the best news you have every heard in your life" and explained that he had a "partner" standing by who had

taught him the "business." Anderson told Csaszar to make sure to bring the money and that Anderson and his partner would take care of the matter that night. Anderson promised that if Csaszar brought the money, he and his "people" would not let Csaszar down. Csaszar said that he would arrive in Chicago between 8 and 9 p.m., that he would go home, get $500, and then go to the "place."

Four hours later, Anderson placed a call to Csaszar. Csaszar was still driving back to Chicago but estimated that he would be arriving in 30 to 45 minutes. Csaszar asked Anderson to open the garage at Jakacki so he could put his truck away. Anderson responded by reminding Csaszar to bring the money. Csaszar said he did not have the money but could get it and then inquired whether Jakacki had given Csaszar's paycheck to Anderson as Csaszar had requested. When Csaszar expressed concern that Anderson had not been given the paycheck, Anderson explained that he had not gone to work that day. Csaszar then told Anderson that, given the problems parking a big truck in front of his home, he was going to go to Jakacki first, without bringing the money, and then return to his house to get the cash. Anderson told Csaszar that he should not do that but he should get the money first. Csaszar said he would page Anderson so that Anderson would know when to go to Jakacki to open the garage. Anderson closed the conversation by telling Csaszar that he should page him when he had the money.

In the final phone call, Csaszar told Anderson he had arrived in Chicago and Anderson confirmed that Csaszar had the money. The videotape of the meeting between Anderson, Agent Shaffer, and Csaszar began with Anderson introducing Agent Shaffer as the man who had taught Anderson the "business" and by informing Csaszar that Agent Shaffer was even better at it than Anderson. Agent Shaffer confirmed the nature of their relationship by saying they had worked

together for 10 years. Csaszar told Shaffer that his ex-boss "had to go." Csaszar explained that Crisan had gotten him into trouble, that she was a witness, and that the only way out of it is if "she's not gonna be no more." Agent Shaffer responded by asking Csaszar if he wanted her killed. Csaszar replied that that is what he needed.

When Agent Shaffer inquired what he was willing to pay, Csaszar said he did not know and that Agent Shaffer should name his price. Anderson spoke up and suggested $500. Csaszar gave Agent Shaffer the money. Agent Shaffer then asked a series of questions regarding where Crisan lived, what she looked like, and what kind of car she drove. Csaszar stated that Crisan lived north of Lawrence on Talman and provided directions to the general area but explained that he did not know the exact address or even what the house looked like, except that it was a two-flat and that the Crisans lived on the first floor. Csaszar described Crisan as a white woman, in her thirties or forties, not tall but not short, not fat but not thin, with dark hair that was neither long nor short. Csaszar had no idea what kind of car Crisan drove. Crisan might be with her husband, but Csaszar doubted their child would be there. Shaffer also inquired of Csaszar how he wanted Crisan killed. Csaszar said he did not care. He further stated that he did not want Crisan tortured and did not want her body found. Shaffer said he would shoot her.

Mark Shaffer

ATF Agent Mark Shaffer testified about his videotaped conversation with Csaszar. Agent Shaffer stated that he had given Csaszar at least two opportunities to withdraw from the plan to kill Crisan. Agent Shaffer testified that, while in the car, Csaszar had written on a scrap of paper Crisan's name, "4325 Talman," and the words "Western" and "north." The piece of paper was introduced into

evidence. Agent Shaffer testified that the address on Talman was inconsistent with Csaszar's directions to Crisan's house.

## Steven Brezette

ATF Agent Steven Brezette testified that he interviewed Csaszar for approximately 20 minutes. Agent Brezette testified that Csaszar told him that Crisan had fired him because he was lazy. His final paycheck was short of money that he was owed and, while admitting there was a confrontation with Crisan, Csaszar denied threatening her. Csaszar stated that following the confrontation with Crisan, he buried a gun in Michigan, but returned there, dug it up, and gave it to police. According to Agent Brezette, Csaszar told him that he "flipped" after the confrontation with Crisan and wanted to kill her. Agent Brezette testified that Csaszar told him it was his idea to kill Crisan and that he had wanted to do so ever since the confrontation with her that had resulted in charges being filed against him. Finally, Agent Brezette testified that Csaszar told him that he had paid Agent Shaffer $500 to kill Crisan, that the police "did good" by arresting him because he would be very dangerous to society, and that he was very embarrassed by the statements he had made in the car with Anderson and Agent Shaffer.

## Robert Rodriguez

Chicago police detective Robert Rodriguez testified that Csaszar also made a statement to him that was largely consistent with the statement made to Agent Brezette. Detective Rodriguez testified that Csaszar told him that Crisan had fired him because of damage to one of the trucks, that he was afraid the charges against him would result in him having to go to jail, and that he had offered Anderson $500 to kill Crisan.

Fabio Valentini

Assistant State's Attorney (ASA) Fabio Valentini testified that Csaszar gave an oral statement to him which was basically the same as the preceding statements. ASA Valentini testified that Csaszar told him he had asked Anderson to kill Crisan within the past week but Anderson had not said whether he would. ASA Valentini testified that Csaszar stated that the day before his arrest, Csaszar had spoken with Anderson by phone and offered him $500 to kill Crisan because he did not want her showing up on the next court date. ASA Valentini stated that he offered Csaszar the choice between giving a handwritten statement or leaving it as an oral statement. ASA Valentini testified that Csaszar opted for the handwritten statement but, when he saw what Valentini had written, he refused to sign it.

Csaszar's Case

Martin Csaszar

Martin Csaszar testified that he began working at Jakacki Bag and Barrel as a truck driver in the fall of 1998, where he met James Anderson, who was employed as a security officer. Csaszar testified that he and Anderson began exchanging casual greetings on an almost daily basis. Csaszar testified that Anderson frequently invited him to go out to eat but Csaszar would decline, saying he had to go home. Csaszar testified that in the spring of 1999, he accepted one of Anderson's invitations because he was tired of being pestered. Csaszar testified that Anderson drove to the restaurant and paid for the meal and, after eating, the men had a long conversation. Anderson told Csaszar that he looked sad and asked why. Csaszar testified that he replied that his wife had left him, which he feared would cause problems with "Immigration," that he did not like being a truck driver, and that he had

legal problems stemming from the incident with Monica Crisan. Csaszar testified that Anderson informed him that he had friends at "Immigration" who could deport Csaszar's wife and clear his record. Csaszar testified that with respect to his desire to change occupations, Anderson told him that he could assist him by helping him get a job as a government agent, although Csaszar would have to acquire the necessary qualifications but could do so by working temporarily for Anderson. With respect to his legal troubles involving Crisan, Anderson explained that Crisan was a crucial witness in the case against Csaszar and the case would be dismissed if she were to disappear. Csaszar testified that Anderson offered to make Crisan disappear but told Csaszar that he would have to give him the sign because he could not do anything on his own.

Csaszar testified that following this initial conversation with Anderson about his problems, he continued their relationship, went to his house, and met Anderson's wife. Csaszar recalled two other specific conversations that the men had regarding his problems with Crisan. Csaszar testified that on one occasion, Anderson appeared in front of his own house (which was located near Jakacki Bag and Barrel), announced that he had killed Crisan the previous night, and warned him to expect a visit from the police. Csaszar testified that during another conversation, Anderson told him that he would help him by bringing federal agents to testify to his character. Csaszar stated that Anderson explained that in order to do this, he would have to provide Anderson with information about Crisan, including her address, phone number, and the best times to call her, so that the federal agents could talk to her and get her side of the story before going in front of the judge on Csaszar's behalf. Csaszar testified that it was in response to this request for information about Crisan that he had drawn the map and provided Anderson with Crisan's address and phone number.

Csaszar testified that Anderson came up with the idea to kill Crisan and that he, Csaszar, had never thought of doing so before meeting Anderson. Csaszar stated that he had no reasonable or logical explanation as to why he got into the car with Anderson and Agent Shaffer, but he stated that he knew at that time that a killing was about to occur. Csaszar further testified that it would haunt him for the rest of his life. Csaszar testified that he had a dispute with Crisan over his paycheck and that he found it aggravating to have to go to court, but he denied that he threatened Crisan with a handgun or had a grudge against her because of his legal problems. Csaszar testified that he did not recall talking to Agent Brezette or Detective Rodriguez and, while he did remember speaking to ASA Valentini, he could not recall making the incriminating statements attributed to him.

The Trial Court's Ruling, Posttrial Motions and Sentencing

The trial court found Csaszar guilty of two counts of solicitation of murder and one count of solicitation of murder for hire. The trial court found Csaszar not guilty of one count of solicitation of murder for hire. Csaszar filed a motion for a new trial. On August 25, 2004, the trial court denied the motion.

The presentence investigation report revealed that, at the time of the offense, Csaszar was 28 years old. He was born in Romania, moved to the United States at the age of 19, and became a naturalized citizen six years later. At the age of seven, Csaszar had been in an accident, which caused him to be in a coma for 10 days. As a result of the accident, Csaszar wore glasses, suffered a "misdirected" eye, and was unable to make decisions on his own. Csaszar's father was not around much while he was growing up, but, when he was, he often physically abused Csaszar's mother. This abuse eventually led to the couple divorcing in 1995 or 1996. Csaszar was also divorced, had no

children, and had been employed for18 months prior to his arrest as a truck driver by Jakacki Bag and Barrel. Csaszar did not use drugs, drink excessively, or belong to any gangs. He had no prior convictions either as a juvenile or as an adult.

In aggravation, the State presented a victim impact statement prepared by Monica Crisan. According to Crisan's statement, the day she learned of Csaszar's attempt to arrange for her murder was the turning point of her life. She was frightened, was constantly vigilant when awake, and had nightmares when asleep. Her fear affected her husband, their daughter, and their business. Crisan stated that she would call her husband asking him to come home and to quit his job so he could stay with her. Her preoccupation with the events involving Csaszar caused arguments between her and her husband. She was afraid to let her daughter out of her sight. Crisan testified that her lack of attention, inability to concentrate, indecisiveness, and fear of other people forced them to close their business.

Additionally, in aggravation, the State argued that a severe sentence was warranted based on two statutory aggravating factors: the defendant's conduct caused or threatened serious harm and the defendant had a prior history of delinquency based on the pending unlawful use of weapons case involving the incident with Crisan. The State also asked the judge to consider as aggravating factors the fact that Csaszar was on bond at the time of the offense and that Crisan was a witness against him.

In mitigation, defense counsel presented evidence that, during the 4½ years spent awaiting trial, Csaszar had used his time constructively in jail by earning his G.E.D. and becoming involved in religious programs. Defense counsel also argued that Csaszar had no prior convictions and had been charged only with misdemeanor unlawful use of a firearm in connection with the earlier Crisan

incident. Finally, defense counsel argued that while in jail, Csaszar lived by the rules and had not been a danger to others.

In allocution, Csaszar stated that his conduct was inexcusable, that he was deeply ashamed of his actions, and that he deserved to be punished. Csaszar explained that he had grown up without religion but while incarcerated he had become a Christian. Csaszar also stated that regardless of the sentence imposed, he would bear no bitterness toward anyone.

The trial court sentenced Csaszar to 30 years' imprisonment for solicitation of murder for hire and to two 20-year terms of imprisonment on the two counts of solicitation of murder. The sentences were ordered to run concurrently. After imposing sentence, the court further ordered that Csaszar submit blood specimens to the Illinois State Police for DNA testing and analysis. Csaszar filed a motion to reconsider the sentence, and the trial court denied it.

## ANALYSIS

### I. Redacted Records

First, Csaszar argues that this court should review the documents that were tendered to defense counsel with redactions following an *in camera* inspection to determine the correctness of the trial court's decision not to disclose the unredacted version of the records to the defense. Csaszar contends that his defense at trial was entrapment and that he is entitled to have access to unredacted portions of the records that may support his theory of the case. The State argues that the trial court correctly determined that Csaszar was not entitled to the unredacted documents. Alternatively, the State argues that this court should not review this issue on appeal because the documents are protected by federal privilege and therefore are not within the jurisdiction of Illinois courts.

-14-

We must determine whether the trial court erred when it denied Csaszar's request for the unredacted documents after the trial judge's *in camera* review. The standard of review for a court's denial of a request for unredacted documents after an *in camera* inspection is abuse of discretion. People v. Bean, 137 Ill. 2d 65, 101-02 (1990).

In Bean, the Illinois Supreme Court held that a defendant was not denied his sixth amendment right of cross- examination or his fourteenth amendment right to a fair trial by the trial court's refusal to order disclosure of a witness's mental health records. Bean, 137 Ill. 2d at 99-100. The Bean court approved the procedure whereby the trial court conducted an *in camera* inspection of the witness' mental health records to determine whether they contained relevant information that could be used to impeach the witness. Bean, 137 Ill. 2d at 99-100. While the records in Bean were privileged under the Mental Health and Developmental Disabilities Confidentiality Act, the court held that such privilege must give way to a defendant's sixth and fourteenth amendment rights but only to the extent that a trial court determined the privileged information to be relevant and impeaching. Bean, 137 Ill. 2d at 100. Just as a trial judge may limit cross-examination to prevent inquiries that are irrelevant, repetitive, or too time-consuming, that harass a witness, or that threaten to distract a jury from the actual issues by unduly emphasizing details of the witness's life, he may also limit a defendant's access to statutorily privileged information. Bean, 137 Ill. 2d at 100-01. When the patient or a therapist asserts the privilege, a trial judge may review a witness's mental health records *in camera* and disclose only those portions that are relevant when that relevance is not outweighed by other factors. Bean, 137 Ill. 2d at 101.

Also in People v. Printy, 232 Ill. App. 3d 735 (1992), the appellate court followed the

decision in <u>Bean</u> and affirmed the trial court's refusal to release mental health records. <u>Printy</u>, 232 Ill. App. 3d at 744. Specifically, in <u>Printy</u>, the defendant sought, in a motion for additional discovery, to examine the mental health records of the victim. <u>Printy</u>, 232 Ill. App. 3d at 744. Those records, which apparently had been reviewed by the State's Attorney's office, were then reviewed *in camera* by the trial court. <u>Printy</u>, 232 Ill. App. 3d at 744. At the hearing following the trial court's *in camera* review, the court allowed the defendant to review the victim's intake report to Central Du Page Hospital, but refused to give the defendant access to the remaining reports because it found the records contained no statements of the victim relating to the incident in question. <u>Printy</u>, 232 Ill. App. 3d at 744. The <u>Printy</u> court further found nothing in the reports relevant to the truth or veracity of the victim, relevant to her memory or perception, or of an impeaching nature. <u>Printy</u>, 232 Ill. App. 3d at 744. The appellate court found that based upon the holding in <u>Bean</u>, the procedure followed by the trial court struck the proper balance between the defendant's right to access information relevant to the credibility of a key witness and the need to maintain the confidentiality of the victim's mental health records. <u>Printy</u>, 232 Ill. App. 3d at 744. The appellate court further noted that it had also reviewed the victim's mental health records submitted to the trial court, and that it agreed with the trial court that those records contained no additional material relevant to the cross-examination or impeachment of the victim. <u>Printy</u>, 232 Ill. App. 3d at 744-45.

In this case, we compared the redacted records that Csaszar received in discovery to the unredacted records reviewed by the trial court *in camera*. See <u>Bean</u>, 137 Ill. 2d at 102; <u>Printy</u>, 232 Ill. App. 3d at 744. After comparing the redacted records to the unredacted records, we find that Csaszar received all the information that was relevant to his case. Consequently, we find that the trial

court did not abuse its discretion when it denied Csaszar's request for the unredacted records.

We note that the State cites People v. Hanks, 210 Ill. App. 3d 817, 822 (1991), in support of its argument that even if this court disagrees with the trial court's decision to deny Csaszar access to the unredacted records, those records were nonetheless beyond the jurisdiction of the Illinois courts because they are federal government or ATF records. We find Hanks to be factually distinguishable from this case: (1) in the instant case, the request for the ATF's records was made prior to trial while in Hanks, the request for the Secret Service tapes was made during the trial; (2) in the instant case, the ATF's redacted records were tendered to the defendant, while in Hanks, we note that the Secret Service's tapes were never obtained by the State or tendered to the defendant. However, we need not reach this issue because we have determined that the trial court did not abuse its discretion when it denied Csaszar access to the unredacted records.

## II. One Act, One Crime

Next, Csaszar was convicted of three offenses: (1) solicitation of murder for hire, in which he solicited Agent Shaffer to murder Crisan; (2) solicitation of murder, in which he solicited Anderson to murder Crisan; and (3) solicitation of murder, in which he solicited Agent Shaffer to murder Crisan. Csaszar argues that the trial court erred in entering the convictions and imposing sentences for the two charges of solicitation of murder because they are the same act. Csaszar also argues that the trial court erred in entering a conviction and imposing sentence on the solicitation of murder charge in which he solicited Agent Shaffer to murder Crisan, because that charge is a lesser-included offense of the charge of solicitation of murder for hire in which he solicited Agent Shaffer to murder Crisan. The State argues that Csaszar has waived this argument for our review because he failed to

raise this issue in the motion to reconsider his sentence. Alternatively, the State argues that Csaszar's argument is without merit because each conviction is based on separate acts. First, we address the State's waiver argument. Our review of the record indicates that indeed Csaszar failed to raise this issue in his motion to reconsider the sentence. However, the waiver rule is a limitation on the parties but not on the jurisdiction of the court. See People v. Hamilton, 179 Ill. 2d 319, 323 (1997). We will address Csaszar's convictions and sentences for solicitation of murder and solicitation of murder for hire because the lesser-included offense argument affects Csaszar's substantial rights. See People v. Baugh, 358 Ill. App. 3d 718, 730 (2005), citing People v. Smith, 183 Ill. 2d 425, 430 (1998).

The Criminal Code of 1961 (Code) provides that "[a] person commits solicitation of murder when, with the intent that the offense of first degree murder be committed, he commands, encourages or requests another to commit that offense." 720 ILCS 5/8-1.1(a) (West 2002). The Code provides that "[a] person commits solicitation of murder for hire when, with the intent that the offense of first degree murder be committed, he procures another to commit that offense pursuant to any contract, agreement, understanding, command or request for money or anything of value." 720 ILCS 5/8-1.2(a) (West 2002). The one-act, one-crime doctrine prohibits multiple convictions when (1) the convictions are carved from precisely the same physical act or (2) one of the offenses is a lesser-included offense of the other. People v. Lindsey, 324 Ill. App. 3d 193, 200 (2001), citing People v. Rodriguez, 169 Ill. 2d 183, 186 (1996), and People v. King, 66 Ill. 2d 551, 566 (1977). Thus, the first step in our analysis will be to determine whether the defendant's conduct consisted of a single physical act or separate acts. People v. Harvey, 211 Ill. 2d 368, 389 (2004). "Multiple

convictions are improper if they are based on precisely the same physical act." Rodriguez, 169 Ill. 2d at 186. "When multiple convictions of greater and lesser offenses are obtained for offenses arising from a single act, a sentence should be imposed on the most serious offense and the convictions on the less serious offenses should be vacated." People v. Garcia, 179 Ill. 2d 55, 71 (1997).

"If the court determines that the defendant's convictions are based on multiple acts, the court will determine whether any of the offenses are lesser-included offenses. If they are, multiple convictions are improper. If none of the offenses are lesser-included offenses, then multiple convictions may stand. Harvey, 211 Ill. 2d at 389-90, 813 N.E.2d at 194-95. We consider this issue *de novo*." People v. Johnson, 368 Ill. App. 3d 1146, 1163 (2006), citing People v. Peacock, 359 Ill. App. 3d 326, 331 (2005).

The charging-instrument approach is used to determine whether there are lesser-included offenses. People v. Kolton, 219 Ill. 2d 353, 360-61 (2006). "The charging[-]instrument approach looks to the allegations in the charging instrument to see whether the description of the greater offense contains a 'broad foundation' or 'main outline' of the lesser offense." Kolton, 219 Ill. 2d at 361. Under the charging-instrument approach, the decision concerning whether an offense is a lesser-included offense involves a case-by-case determination "using the factual description of the charged offense in the indictment." Kolton, 219 Ill. 2d at 367. "A lesser offense will be 'included' in the charged offense if the factual description of the charged offense describes, in a broad way, the conduct necessary for the commission of the lesser offense and any elements not explicitly set forth in the indictment can reasonably be inferred." Kolton, 219 Ill. 2d at 367. Finally, if it is determined that a particular offense is a lesser-included offense of the charged crime, the evidence must be

-19-

examined to see if it supports a conviction of the lesser-included offense. Kolton, 219 Ill. 2d at 361, citing People v. Novak, 163 Ill. 2d 93, 108 (1994).

In this case, Csaszar was charged as follows in the charging instrument:

"Count 2: Solicitation of Murder for Hire in that Csaszar, with intent that the offense of first degree murder be committed, to wit: that Monica Crisan be killed, solicited undercover ATF agent Mark Shaffer to commit said offense of first degree murder, pursuant to an agreement or contract for money.

Count 3: Solicitation of Murder in that Csaszar, with intent that the offense of first degree murder be committed, it wit: that Monica Crisan be killed, requested James Anderson to commit said offense of first degree murder.

Count 4: Solicitation of Murder in that Csaszar, with intent that the offense of first degree murder be committed, it wit: that Monica Crisan be killed, requested undercover ATG agent Mark Shaffer to commit said offense of first degree murder."

### A. Multiple Convictions for the Same Physical Act

Csaszar argues that the two charges for solicitation of murder, counts III and IV, violate the one-act, one-crime doctrine because the solicitation of murder convictions involve the same acts. Our review of the charging instrument indicates that the two solicitation of murder charges are identical,

except count III alleges that Csaszar requested that Anderson commit Crisan's murder and count IV alleges that Csaszar requested that Agent Shaffer commit Crisan's murder. We must determine whether Csaszar's solicitation of Anderson and Shaffer consisted of a single physical act or separate acts. See Harvey, 211 Ill. 2d at 389. Our review of the facts in this case indicates that Csaszar initially approached Anderson and requested that he murder Crisan. Anderson, however, told Csaszar that he did not commit murders and, instead, introduced him to undercover Agent Shaffer at a later date. When Csaszar met Agent Shaffer, he requested that Agent Shaffer murder Crisan. We find Csaszar's initial request that Anderson murder Crisan constituted one act of solicitation of murder, and that Csaszar's later meeting with Agent Shaffer and request that he murder Crisan constituted a second act of solicitation of murder. The law is clear that multiple convictions are improper if they are based on precisely the same physical act. Rodriguez, 169 Ill. 2d at 186. In this case, we find that the evidence in the record establishes that there were two solicitations on different dates, of different people, to murder Monica Crisan, and therefore, the convictions were based on two different acts. King, 66 Ill. 2d at 566 (the definition of "act" is any overt or outward manifestation that will support a different offense). Accordingly, we hold Csaszar's two convictions for solicitation of murder do not violate the same physical act test of the one-act, one-crime doctrine.

B. Multiple Convictions When One Charged Offense is a Lesser-Included Offense of Another

Charged Offense

Next, we will address Csaszar's argument that the charge of solicitation of murder for hire, involving Agent Shaffer, and the charge of solicitation of murder, involving Agent Shaffer, counts II and IV, violate the one-act, one-crime doctrine because one offense is a lesser-included offense of

the other offense.

Our review of the charging instrument reveals a main outline for both of the charged offenses: solicitation of murder and solicitation of murder for hire. The charging instrument alleged that (1) Csaszar intended for the offense of first degree murder to be committed against Crisan; (2) Csaszar solicited another person (either Agent Shaffer or Anderson) to commit the offense; and (3) Csaszar solicited another person pursuant to an agreement for money. We note that the crime of solicitation of murder is complete when the defendant makes the request for another to commit first degree murder. People v. Woodard, 367 Ill. App. 3d 304, 317 (2006), citing People v. Sims, 315 Ill. App. 3d 518, 521 (2000). However, the solicitation of murder for hire count contains one additional element that is not included in the solicitation of murder counts. After reviewing the charging instruments, we find that the acts in the charging instruments are the same and the offenses of solicitation of murder and solicitation of murder for hire contain the same elements, except the offense of solicitation of murder for hire includes one additional element. Compare 720 ILCS 5/8-1.1(a) (West 2002) with 720 ILCS 5/8-1.2(a) (West 2002). Specifically, the solicitation of murder for hire count required Csaszar to solicit Agent Shaffer, pursuant to an agreement or contract for money. We also find that the evidence adduced at the trial supported a conviction on the greater offense and on the lesser-included offense. Therefore, we find that the offense of solicitation of murder, in which Csaszar solicited Agent Shaffer to murder Crisan, is a lesser-included offense of solicitation of murder for hire, in which Csaszar solicited Agent Shaffer to murder Crisan pursuant to an agreement for money. Accordingly, we affirm Csaszar's conviction of solicitation of murder for hire and vacate his solicitation of murder conviction and sentence because it is a lesser-included

offense of solicitation of murder for hire.

The State, however, relies on People v. Voit, 355 Ill. App. 3d 1015 (2004), to support its argument that the trial court did not violate the one-act, one-crime doctrine when it entered convictions and imposed sentences on Csaszar for the two solicitation of murder and the one solicitation of murder for hire. In Voit, the defendant argued that her convictions for solicitation of murder for hire and her attempted murder are based on the same physical act. Voit, 355 Ill. App. 3d at 1029. The Voit court reviewed the charging documents and determined that it differentiated between the charged offenses. Voit, 355 Ill. App. 3d at 1029. The court found that the defendant was charged with solicitation of murder for hire based on her encouragement of Kaufmann, and that the defendant was charged with attempted murder by providing Kaufmann not only the money, but also personal information about the victim, a photograph of the victim, and the victim's car key, acts that the Voit court found are beyond those required to prove solicitation of murder for hire. Voit, 355 Ill. App. 3d at 1029. Accordingly, the Voit court found that the defendant engaged in separate acts, and, therefore, the trial court did not violate the one-act, one-crime doctrine. Voit, 355 Ill. App. 3d at 1029.

Voit, however, is distinguishable from the present case. The Voit court reviewed a case where a defendant was charged with and convicted of solicitation of murder for hire and of attempted first degree murder. Here, we are reviewing a case where the defendant was charged with and convicted of solicitation of murder and of solicitation of murder for hire. While the defendant in Voit was charged with and convicted of attempted first degree murder, we note that attempted first degree murder was not an offense charged in Csaszar's case. We also note that the elements of the offenses

of solicitation of murder and of solicitation of murder for hire are different from the elements of the offense of attempted first degree murder. Compare 720 ILCS 5/8-1.1(a), 8-1.2(a) (West 2002) with 720 ILCS 5/8-4(a) (West 2002). With the solicitation offenses, the defendant requests or procures another person to commit the murder, but with the offense of attempt, the defendant, rather than another person, takes a substantial step toward the commission of a specific offense, in this case murder. Compare 720 ILCS 5/8-1.1(a), 8-1.2(a) (West 2002) with 720 ILCS 5/8-4(a) (West 2002). Most importantly, in Voit the reviewing court was attempting to determine if the defendant violated the one-act, one-crime doctrine because the convictions were carved from the same act, while this court is attempting to determine if the trial court violated the one-act, one-crime doctrine (1) because the convictions were carved from the same act, and (2) because the offense of solicitation of murder is a lesser-included offense of solicitation of murder for hire. Consequently, given the fact this court is comparing different offenses with different elements, and is attempting to determine, unlike the Voit court, if one of the charged offenses, for which there was a conviction, is a lesser-included offense of another charged offense, for which there was a conviction, we find that the facts in Voit are distinguishable from the facts in this case.

Finally, the record reveals that during the first trial, the jury found Csaszar not guilty of solicitation of murder for hire in the charge naming James Anderson. The record also reveals that during the second trial, the judge found Csaszar guilty of the charge of solicitation of murder in the charge naming James Anderson. In this case, we have found solicitation of murder to be a lesser-included offense of solicitation of murder for hire. Accordingly, because Csaszar was found not guilty of the charge of solicitation of murder for hire in the charge naming James Anderson during

the first trial, and because solicitation of murder is a lesser-included offense of solicitation of murder for hire, we vacate the solicitation of murder conviction. People v. Henry, 204 Ill. 2d 267, 289 (2003), quoting People v. Knaff, 196 Ill. 2d 460, 471 (2001) (" '[T]he acquittal of a defendant on an indictment for an offense which includes lesser offenses, operates also as an acquittal, and as a bar to any subsequent prosecution, of all included lesser offenses of which he might have been convicted on the indictment charging the higher offense' ").

### III. Aggravating Sentencing Factors

Next, Csaszar argues that the trial court considered improper aggravating factors and, therefore, this court should remand this matter to the trial court for a new sentencing hearing. The trial court has broad discretionary powers in choosing the appropriate sentence a defendant should receive. People v. Jones, 168 Ill. 2d 367, 373 (1995). "A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case and depends upon many factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age." People v. Donath, 357 Ill. App. 3d 57, 72 (2005), citing People v. Perruquet, 68 Ill. 2d 149, 154 (1977). "The defendant's history, character, rehabilitative potential, the seriousness of the offense, the need to protect society and the need for deterrence and punishment are all factors to be considered in fashioning a sentence." Donath, 357 Ill. App. 3d at 72, citing People v. Jones, 295 Ill. App. 3d 444, 455 (1998). "There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, and the court is presumed to have considered any evidence in mitigation which is before it." Donath, 357 Ill. App. 3d at 72, citing People v. Partin, 156 Ill. App. 3d 365, 373 (1987). The trial court has

discretion in imposing a sentence and a reviewing court has the power to disturb the sentence only if the trial court abused its discretion. Jones, 168 Ill. 2d at 373-74.

In this case, the trial court considered the statutory factors in aggravation and in mitigation when it sentenced Csaszar. The trial court found that many of the factors either did not apply or did not weigh in Csaszar's favor and stated that it would consider those factors aside from the pending unlawful use of weapons change. While section 5-5-3.2(a) of the Unified Code delineates 17 aggravating factors that a trial court may consider (730 ILCS 5/5-5-3.2(a) (West 1998)), we note that the court only discussed the first 15 factors and found that the remaining statutory factors did not apply to this case. The trial court specifically discussed the following 15 factors delineated in section 5-5-3.1 of the Unified Code:

> "(a) The following factors shall be accorded weight in favor of imposing a term of imprisonment or may be considered by the court as reasons to impose a more severe sentence under Section 5-8-1:
>
> (1) the defendant's conduct caused or threatened serious harm;
>
> (2) the defendant received compensation for committing the offense;
>
> (3) the defendant has a history of prior delinquency or criminal activity;
>
> (4) the defendant, by the duties of his office or by his position, was obliged to prevent the particular offense committed or to bring the offenders committing it to justice;

(5) the defendant held public office at the time of the offense ***;

(6) the defendant utilized his professional reputation or position in the community to commit the offense ***;

(7) the sentence is necessary to deter others from committing the same crime;

(8) the defendant committed the offense against a person 60 years of age or older or such person's property;

(9) the defendant committed the offense against a person who is physically handicapped or such person's property;

(10) by reason of another individual's actual or perceived race, color, creed, religion, ancestry, gender, sexual orientation, physical or mental disability, or national origin, the defendant committed the offense ***;

(11) the offense took place in a place of worship or on the grounds of a place of worship, ***;

(12) the defendant was convicted of a felony committed while he was released on bail or his own recognizance pending trial for a prior felony and was convicted of such prior felony, ***;

(13) the defendant committed or attempted to commit a felony while he was wearing a bulletproof vest. ***;

(14) the defendant held a position of trust or supervision ***;

(15) the defendant committed an offense related to the activities of an organized gang." 730 ILCS 5/5-5-3.2(a) (West 1998).

The trial court reviewed each of the aforementioned 15 factors and specifically found that factors 4, 5, 6, 8, 9, 10, 11, 13, and 15 were not applicable to this case. Regarding factors 1, 2, 3, 7, 12, and 14, the trial court made the following findings:

"[1] In aggravation, the defendant's conduct caused or threatened serious harm. You threatened to kill Monica Crisan, that you wanted her killed, not just threatened, that you were paying someone to kill her. [2] The defendant received compensation for committing this offense. You did not receive compensation. You were giving someone compensation to kill her. [3] The defendant has a history of prior delinquency. You did have the pending unlawful use of weapon in this courtroom, and that was the only case that you had prior to this. * * *

Number 7, that the sentence is necessary to deter other from committing this same offense, the same crime. Certainly the community and society needs to know that human life is valid. * * *

Number 12, that the defendant was convicted of a felony while he was released on bail on his or her own recognizance pending trial. Yes, you were pending trial in this very same courtroom. The case

-28-

was a felony and eventually it turned to a misdemeanor. It just so happened it was the victim who was testifying against you, not a coincidence. * * * [14] The defendant held a position of trust or supervision but not limited to family member as described to be a day care or babysitter. You were not in such a position, but you were an employee of this person."

We find that the record clearly establishes that the trial court meticulously weighed the statutory factors in mitigation and aggravation. We note that nothing in the record suggests that the trial court weighed one aggravating factor more heavily than another factor. Furthermore, we note that there is a strong presumption that the trial court based its sentencing decision on proper legal reasoning. Donath, 357 Ill. App. 3d at 72; Partin, 156 Ill. App. 3d at 373. That presumption is strengthened by the fact that Csaszar's concurrent sentences were within the permissible statutory sentencing range. Csaszar's 30-year sentence for his conviction for solicitation of murder for hire is within the midrange of the 20- to 40-year sentence that the trial court can impose under the statutory guidelines. See 720 ILCS 5/8-1.2(b) (West 1998). We need not consider whether the court abused its discretion when it imposed Csaszar's 20-year sentence for his solicitation of murder convictions because we have vacated those convictions. See 720 ILCS 5/8-1.1(b) (West 1998). Consequently, the record in this case demonstrates that the trial court carefully considered a wide range of factors when sentencing Csaszar. People v. Bowman, 357 Ill. App. 3d 290, 304 (2005) (trial court did not abuse its discretion in sentencing the defendant within the statutory range where the trial court considered mitigation and aggravation evidence, the presentence investigation, the defendant's

rehabilitative potential, and letters from the defendant's coworkers and family).

Nonetheless, Csaszar argues that the trial court abused its discretion in sentencing him because it considered: (1) evidence that his conduct caused or threatened serious harm; (2) the unlawful use of a weapon charge; (3) his status as an immigrant; and (4) evidence concerning the effect the crime had on Crisan's life. We review each of the these four contentions below.

## A. Serious Harm

Regarding the first statutory aggravating factor --- the defendant's conduct caused or threatened serious harm (730 ILCS 5/5-5-3.2(a)(1) (West 1998)) --- Csaszar argues that the trial court improperly focused on the fact that he intended for Crisan to die, rather than on the nature and the extent of the force he authorized Shaffer to use to commit the murder. The State argues that while it is true that the trial court may not rely upon a factor implicit in the offense in sentencing a defendant, that does not mean that every mention of such facts subjects a sentence to reversal.

Generally, a sentencing court may consider as a justification for imposing a more severe sentence evidence that the offender's conduct caused or threatened serious harm. Bowman, 357 Ill. App. 3d at 304. The trial court may consider the nature of the offense, including the circumstances and extent of each element as committed, as a factor when imposing a sentence. Bowman, 357 Ill. App. 3d at 304, citing People v. Miller, 225 Ill. App. 3d 92, 104 (1992). However, it is well settled that it is error for a judge to consider in aggravation a factor that is inherent in the offense for which the defendant is being sentenced. People v. Gonzalez, 151 Ill. 2d 79, 83-84 (1992), citing People v. Ferguson, 132 Ill. 2d 86, 97 (1989); People v. Saldivar, 113 Ill. 2d 256, 272 (1986). Yet, not every instance in which an aggravating factor is improperly considered in sentencing calls for automatic

reversal, and the cases make it clear that this rule should not be applied rigidly. People v. Burnette, 325 Ill. App. 3d 792, 809 (2001), citing People v. Saldivar, 113 Ill. 2d 256, 268-69 (1986).

Csaszar cites People v. Latona, 268 Ill. App. 3d 718, 730 (1994), to support his argument that his sentence should be reversed and remanded for a new sentencing hearing. In Latona, the defendant argued that that the trial court improperly considered as an aggravating factor evidence that his conduct threatened serious harm. The Latona court found that the trial court focused only on the type of beating that the defendant wanted Jordan to inflict upon the victim. Latona, 268 Ill. App. 3d at 730. The trial court found that the type of beating the victim was to receive was the defendant's plan before the defendant and Jordan agreed that the victim should be killed. Latona, 268 Ill. App. 3d at 730. The Latona court found that after they agreed to kill the victim, there was no discussion regarding the manner in which Shamoon was to be killed. Latona, 268 Ill. App. 3d at 730. The Latona court also found that the only factor that the trial court could have relied on was the threat of death and that that was improper. Latona, 268 Ill. App. 3d at 730. The Latona court further found that the trial court did not merely mention in passing that the defendant's conduct threatened serious harm, but the court appeared to give this factor the same weight as the other factors listed in aggravation. Latona, 268 Ill. App. 3d at 730. Consequently, the Latona court reasoned that because it could not conclude that the weight the trial court placed on this improper factor was insignificant, the cause was remanded for a new sentencing hearing. Latona, 268 Ill. App. 3d at 730.

While we are mindful of the facts in Latona and its holding, we believe that the facts in this case establish that the trial court employed a more balanced approach during sentencing because here the trial court meticulously weighed the aggravating and mitigating factors and did not give undue

weight to an improper factor. We believe that People v. Jackson, 319 Ill. App. 3d 110 (2001), has facts that are more analogous to the facts in this case. In Jackson, the defendant argued that the trial court erred by considering in aggravation the harm caused to the victim. Jackson, 319 Ill. App. 3d at 114. The Jackson court found that although the trial court observed that defendant's conduct caused the victim's harm, the record clearly revealed that the court relied upon other aggravating factors in sentencing defendant, *i.e.*, the need to protect society from defendant, defendant's "history of prior delinquency," and the need "to deter others from committing the same crime." Jackson, 319 Ill. App. 3d at 115. The Jackson court held that any weight that the trial court placed on the fact that the defendant's conduct caused harm was insignificant and did not result in a greater sentence. Jackson, 319 Ill. App. 3d at 115. Accordingly, the Jackson court rejected defendant's argument that his case had to be remanded for resentencing. Jackson, 319 Ill. App. 3d at 115.

In this case, like Jackson, we note that the although the trial court mentioned the harm to Crisan, it also considered five other statutory aggravating factors and considered the mitigating factor of Csaszar's lack of criminal history. Nothing in the record indicates that the trial court gave greater weight to this factor than to other factors. We note that a trial judge's statements at sentencing may not be considered in isolation. People v. Hendrix, 250 Ill. App. 3d 88, 105 (1993), citing People v. McGlasson, 219 Ill. App. 3d 252 (1991). While accepting Csaszar's contention that the trial court considered an improper aggravating factor, but viewing the sentencing hearing as a whole, we find it unnecessary to remand for resentencing. See People v. Gilliam, 172 Ill. 2d 484, 521 (1996) (where the reviewing court can determine from the record that the weight the trial court placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater

sentence, it is not necessary to remand for resentencing); People v. Garry, 323 Ill. App. 3d 292, 303 (2001) (finding that a review of the record reveals that the aggravating factor of bodily harm did not lead to a greater sentence); People v. Burge, 254 Ill. App. 3d 85, 91 (1993) ("[w]hen the weight placed on an improperly considered aggravating factor is so insignificant that it did not lead to a greater sentence, a remand for resentencing is not required"); Hendrix, 250 Ill. App. 3d at 105 (finding that the trial judge's statements summarizing the relevant factors does not indicate that the court focused primarily on the fact that the defendant's conduct caused the death of the deceased). As we have already found, our review of the record indicates that the trial court carefully summarized the statutory aggravating and mitigating factors, even those factors that did not apply to this case. Accordingly, we find that while the trial court mentioned that Csaszar wanted Crisan dead, the reference was insignificant and it did not lead to a greater sentence; therefore, it does not warrant reversal. See Burnette, 325 Ill. App. 3d at 811; Jackson, 319 Ill. App. 3d at 115.

### B. Prior Felony Conviction

Next, regarding the twelfth statutory aggravating factor ---a prior felony conviction (730 ILCS 5/5-5-3.2(a)(12) (West 1998)) --- Csaszar argues that the trial court incorrectly considered this factor because he had not been convicted of a felony. Csaszar argues that the pending case for the unlawful use of weapon charge had been reduced to a misdemeanor and that he was never convicted of that offense. The State argues that the trial court may consider prior criminal activity as a nonstatutory aggravating factor.

In this case, we note that, in mitigation, the trial court specifically stated that Csaszar's lack of criminal history would be taken into consideration. We also note that the trial court, when

discussing this factor in aggravation, stated that the pending unlawful use of a weapon charge was not a felony because it had been reduced to a misdemeanor. Therefore, the very points that Csaszar argues the trial court should have considered are indeed the very points that the trial court stated that it considered at the sentencing hearing. However, even if the trial court considered the misdemeanor unlawful use of a weapon charge, which Csaszar was never convicted of, there is no error because in aggravation the trial court may consider evidence of a defendant's prior misconduct, even though that misconduct may not have resulted in prosecution or conviction. See People v. Davis, 205 Ill. 2d 349, 367 (2002), citing People v. Smith, 176 Ill. 2d 217, 255 (1997) and People v. Lego, 116 Ill. 2d 323, 346-47 (1987). Accordingly, we find that the trial court did not abuse its discretion when it considered Csaszar's unlawful use of a weapon charge.

## C. Immigrant Status

Next, Csaszar contends that the trial court improperly focused on the fact that he and Crisan were Romanian immigrants who had come to the United States of America. Csaszar cites to several portions of the sentencing record to support this argument. The State argues that Csaszar's argument is based on a gross and disingenuous mischaracterization of the trial judge's comments at the sentencing hearing. We agree with the State.

Indeed, our review of the record indicates that the trial court made reference to Csaszar and Crisan's Romanian backgrounds when it made the following statement:

"Monica Crisan is a woman from your own country. She came to the United States. She has a husband and a child. You knew that she was a wife and mother and her and her husband were not only

-34-

> trying to make a better life for themselves here in the United States but for other people from her own country. You came here also from the same country. They wanted to help you. So this person who comes from the same type of background where you say there's violence in your country where you came from, where people need to know right from wrong, she came here also to have a better life and she and her husband wanted to let you have a better life."

We find the trial court's statements failed to reveal that Csaszar's or Crisan's immigrant status was negatively considered. To the contrary, the trial judge's statements reveal that she saw both Csaszar and Crisan as wanting a better life and that Crisan tried to help Csaszar achieve a better life in the United States, but that Csaszar lacked an appreciation for their common struggle and goals and instead solicited others to murder her. The trial court's statements were made in response to Csaszar's allocution in which he referenced his background and growing up with no morals. The trial court's statements do not reveal a bias against immigrants; rather, they merely point out that the court noted that Csaszar and Crisan were from the same country. Accordingly, we find that Csaszar's argument that the trial court used his immigrant status as an aggravating factor in sentencing him is devoid of merit.

### D. Evidence of Harm to Victim

Csaszar maintains that the trial judge erred in characterizing his crimes as having destroyed the Crisans' business and personal lives. However, Csaszar makes the following acknowledgment in his brief:

> "Crisan suffered great anxiety after learning that Csaszar had been accused of trying to hire somone to kill her. Her victim impact statement indicates that the incident eventually led to arguments with her husband, extraordinary vigilance and concern for the safety of herself and her daughter, and the closing of her business."

Notwithstanding these undisputed, acknowledged facts, Csaszar argues that the trial court's statement that he destroyed Crisan's life was not supported by the evidence. The State maintains that the court's comments were properly based on the evidence. We find that Csaszar's argument is completely devoid of merit. Given the unrebutted facts that Csaszar's conduct impacted Crisan's life, we find that the trial judge did not improperly characterize or exaggerate the harm to Crisan. Accordingly, we hold that the trial court did not abuse its discretion in sentencing Csaszar.

## IV. Extraction of Blood and DNA Profile

Finally, Csaszar contends that the compulsory extraction and inclusion of his DNA in state and national databases, pursuant to section 5-4-3 of the Unified Code of Corrections (730 ILCS 5/5-4-3 (West 2002)), violates his fourth amendment right to be free from unreasonable searches and seizures. In People v. Garvin, 219 Ill. 2d 104, 122-24 (2006), the Illinois Supreme Court affirmed the constitutionality of the statute authorizing extraction and storing of DNA. The Garvin court noted that a convicted felon's privacy rights are "substantially reduced due to his status as a convicted felon." Garvin, 219 Ill. 2d at 124. The Garvin court also held that "the State's interest in effective crime investigations and prevention, as advanced by section 5-4-3, outweighs defendant's privacy interest as a convicted felon." Garvin, 219 Ill. 2d at 125. The Garvin court rejected the defendant's

constitutional challenge as follows: "We also hold that the DNA sampling and database mandated by section 5-4-3 is constitutional both as applied in defendant's case and on its face." Garvin, 219 Ill. 2d at 125. Accordingly, following Garvin, we hold that section 5-4-3 does not violate Csaszar's fourth amendment right to be free from unreasonable searches and seizures and is constitutional.

CONCLUSION

For the foregoing reasons, the trial court's conviction for solicitation of murder for hire that involved Agent Shaffer, is affirmed, but the trial court's conviction for solicitation of murder that involved Anderson, and the conviction for solicitation of murder that involved Agent Shaffer are vacated.

Affirmed in part and reversed in part.

QUINN, P.J., and MURPHY, J., concur.