THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CURTIS T. ROBINSON, Defendant-Appellant.

Second District    No. 2—07—0088

Opinion filed April 30, 2009.—Rehearing denied July 1, 2009.

O'MALLEY, J., specially concurring.

Thomas A. Lilien and Yasemin Eken, both of State Appellate Defender's Office, of Elgin, for appellant.

John H. Vogt, State's Attorney, of Freeport (Lawrence M. Bauer and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

Following a jury trial, defendant, Curtis T. Robinson, was convicted of unlawful possession with intent to deliver more than 100 grams but less than 400 grams of cocaine (720 ILCS 570/401(a)(2)(B) (West 2004)) and sentenced to 25 years' imprisonment. On appeal, defendant argues that: (1) the trial court erred in denying his motions to quash his arrest and suppress evidence; (2) the trial court improperly admitted hearsay testimony, irrelevant evidence about controlled drug buys, and other-crimes evidence; (3) the State made improper comments in its rebuttal closing argument; (4) during sentencing, the trial court improperly considered in aggravation factors inherent in the offense; and (5) he is entitled to monetary credit against his fines for time he served in jail before sentencing. We affirm as modified.

## I. BACKGROUND

### A. Motions to Suppress

Defendant was charged by complaint on April 19, 2004, three days after the incident. A hearing on defendant's various motions to quash

his arrest and suppress evidence took place on September 12, 2006. Officer Matthew Summers of the Freeport police department testified as follows. On April 16, 2004, around noon, he received an anonymous call on his cell phone. The informant said that defendant frequently made trips to Rockford to pick up cocaine to bring back to Freeport and that defendant was planning to do so that day. The caller said that defendant would be riding in a maroon Cadillac driven by a black female with a first name similar to Lashanda. The caller did not know the driver's last name but knew that she had a twin sister. The caller said that Summers could find defendant and the Cadillac on the 300 block of East Pleasant, where defendant lived. Summers then met with the caller in person, though he still did not know who she was. She repeated basically the same information that she had told him over the phone. Summers agreed that he did not mention the face-to-face meeting in his police report.

After the meeting, sometime before 1 p.m., Summers drove to the 300 block of East Pleasant. He saw defendant in front of an apartment building, and a maroon Cadillac was parked on the street. Summers ran the Cadillac's license plate, and it came back as a 1986 Chevrolet registered to Lathecia Walker. Summers arranged to have a "loose surveillance" of the vehicle, whereby officers were positioned to see if the car left Freeport "in a manner that was explained to us."

Summers received a second call from the informant saying that defendant was leaving the area in the Cadillac. Summers returned to Pleasant Street and saw the Cadillac pulling away. He followed it until it turned onto Route 20 and began driving east toward Rockford. Summers then called Sergeant Mark Marti and told him that he would need someone to help stop the Cadillac if it returned to Freeport.

At about 11:15 p.m., Summers saw the Cadillac returning to Freeport on Route 20. He began following it back to Freeport and contacted Marti. Marti stopped the vehicle on Route 20, near Hollywood Road, based on the improper registration. There were no streetlights or sidewalks in the area.

When Summers arrived at the scene, Marti and auxiliary officer Klinefelter were present. The owner and driver of the vehicle was identified as Lathecia Walker. Defendant was in the front passenger seat. Marti asked Walker to step to the rear of the Cadillac and advised her that she would be receiving a traffic citation for improper registration. Summers told her that she was free to leave but that the car would have to remain at the scene for further investigation. He also told Walker that she could wait in the back of the squad car while he conducted the investigation, and she agreed. Summers again informed Walker that she was not under arrest. He said that he would leave the back door of the squad car open so that it would not lock.

Summers then took defendant out of the Cadillac and searched him for officer safety. Summers next told him that he was free to leave but that the vehicle had to remain at the scene. He did not direct defendant where to go other than to just stand away from the vehicle. Summers told defendant that he was going to get a search warrant for the car because he had reason to believe that defendant was transporting drugs from Freeport to Rockford. Summers asked defendant if there were any drugs in the car, and defendant said no. Summers then told him that he thought there were enough drugs in the car to send his girlfriend to prison for a long time and that, if defendant were honest about what was in the car, he may be able to help his girlfriend out. Defendant then asked if he could call Summers the next day because he did not want to see Walker go to prison. Summers asked for and obtained consent to search defendant's person for drugs.

Summers then went over to Walker and asked if she would consent to have the officers search her car. Walker agreed, and Summers informed defendant. Defendant then began to yell at Walker not to allow the officers to search the car. Summers opened the driver's-side door, and at that point Marti advised him that he believed that Walker had revoked her consent to the vehicle search. Summers decided it was best to tow the vehicle and get a search warrant.

While waiting for the tow truck, Summers walked past defendant, and defendant said, " 'Can I ask you something?' " Summers told defendant again that he was free to leave and that he would talk to him only if he wanted to talk about "the case that was going on." Defendant asked if someone had "told on him," and Summers asked if he could be more specific. Defendant said that he just wanted to know if someone had told on him. Summers asked if defendant wanted to talk about the drugs that were going to be found in the car. Defendant declined.

At that point Walker's citation was completed, and either she or defendant made a phone call. While the officers were waiting for the tow truck, a vehicle came and picked up defendant and Walker. When asked if he knew whether defendant or Walker "had a cell phone before they actually took out their cell phones to call for a ride," Summers replied that he did not think that defendant had one on his person and did not know if the phone was "in the car or in a purse or where it was." Summers agreed that "someone called [defendant] on his cell phone and someone picked him up." Defendant never complained about not being able to leave during the stop.

Summers later obtained a search warrant for the car and, in the pouch behind the driver's seat, he found two baggies of cocaine. Summers had told defendant he was free to leave at least twice during the stop.

Mark Marti provided the following testimony. Summers had told him that the Cadillac had an improper registration and that there was information that it would be carrying drugs. When Marti first stopped the car, Walker told him that she had the registration transferred. Marti checked the paperwork and asked defendant if he knew anything about the transfer. Defendant rifled through some papers, but Marti did not find any evidence that Walker had the paperwork transferred properly. He issued her a citation for improper registration. There was a videotape of the entire stop, but it lacked audio because the audio was a separate component that Marti had forgotten to bring with him.

The State requested that the trial court take judicial notice of the traffic ticket issued to Walker, the complaint for the search warrant, and the search warrant. Defendant objected to judicial notice of the complaint for the search warrant. The trial court took judicial notice of all three documents.

The trial court denied defendant's motions to quash his arrest and suppress evidence. It ruled that Walker was lawfully stopped for improper vehicle registration and that the subsequent encounter between the police and defendant was consensual, rather than a seizure.

## B. Motions *In Limine*

Before trial, defendant filed several motions *in limine* requesting, among other things, that the trial court bar: evidence regarding the information provided by the anonymous informant; Summers' statement to defendant at the time of the traffic stop that he "had reason to believe that [defendant] was transporting drugs from Rockford to Freeport"; evidence that the police knew defendant from prior contacts; and testimony from defendant's parole officer that he had been looking for defendant after the incident but could not find him. The State did not object to the exclusion of information regarding the anonymous tip. However, the State pointed out that the police were not able to find defendant for over one year after the arrest warrant was issued, and it argued that Summers' statement to defendant regarding drugs was relevant to show defendant's awareness of the potential charge against him and was proof of the reason for his flight, as was the testimony from defendant's parole officer.

The trial court ruled that Summers would be allowed to testify that he told defendant he had reason to believe he was transporting drugs from Rockford to Freeport, reasoning that it had already ruled that the conversations between defendant and Summers were admissible, and because the evidence was relevant to the State's theory of flight. The trial court further ruled that the police could not testify

that they were familiar with defendant from prior contacts; that the police could testify regarding what they did to try to locate defendant, though they could not opine that his flight indicated consciousness of guilt; and that defendant's parole agent could testify regarding efforts to contact defendant, though the agent had to refer to himself as a law enforcement officer rather than a parole officer and not mention defendant's parolee status.

## C. Trial

At trial, Marti provided testimony consistent with that of the hearing on the motions to quash and suppress. He further testified that, when he stopped the Cadillac, defendant was leaned back in the front passenger seat, almost in a fully reclined position. Defendant was an arm's length or less away from the pouch on the back of the driver's seat.

Summers also testified consistently with his testimony from the hearing on the motions to quash and suppress regarding what occurred at the traffic stop. He further testified as follows. In 1998, he was assigned to the Freeport Police Emergency Response Team, which usually executed high risk and narcotics search warrants and arrest warrants for violent criminals. In April 2004, he was working in the capacity of a street crimes officer, following up on gang activity, weapons violations, and narcotics investigations. The majority of the work involved the sale of drugs within Freeport. Much of the information came from confidential informants or undercover officers. Summers described how the police used confidential informants in controlled drug buys. Usually the purchases would be one to two rocks of cocaine for $20 each, with one rock weighing one-tenth to two-tenths of one gram. The rocks were usually packaged in baggie corners. Mid-level dealers often required purchases of at least $100 to $150, and they sometimes supplied drugs to lower-level dealers.

Regarding the traffic stop on April 16, 2004, Summers additionally testified that Walker was 18 years old at the time. Defendant was reclined so far down in the passenger's seat that, when Summers was following the car, he could not tell it had a passenger. The pouch on the back of the driver's seat was only one or two feet away from where defendant was sitting. After talking to Walker about the registration, Summers said that she was free to leave but that her vehicle would have to stay. Usually people have to wait until citations are issued to them before they have permission to leave, but in this case, because of Summers' belief that there were narcotics in the car, Walker was told that she was free to leave and that the police would get the ticket to her later. Walker chose to wait. When they were waiting for the tow

truck to arrive, defendant asked if Summers would get his keys out of the car. When Summers was handing him the keys, defendant asked if he could talk to him and asked if somebody had told on him. After Walker was given her ticket, she and defendant "chose to walk a short distance away and make a phone call to have someone come pick them up."

Summers identified papers given to Marti during the vehicle stop, including an insurance card, a bill of sale, and a sales tax form for the Cadillac. They were in Walker's name. When Summers eventually searched the Cadillac pursuant to the warrant, he found medical discharge papers in defendant's name from February 2004 and from the day of the stop. He also found, in the glove box, an identification card for defendant and a March 2004 oil change receipt in defendant's name for the Cadillac. He found a telephone bill in defendant's name in the trunk. The pouch behind the driver's seat contained Walker's pay stub for February 16 to 22, 2004, as well as two sandwich bags of a white, rock-like substance. The substance field-tested positive for cocaine. Based on Summers' experience, the quantity of cocaine indicated that it was not for personal use but rather that someone intended to separate it and sell it in individual packages.

Summers obtained a warrant for defendant's arrest the following day, on April 17, 2004. He conducted surveillance on 311 East Pleasant Street and defendant's mother's address, which was on one of defendant's bills, but could not find defendant. Summers received information that defendant was possibly in Rockford, Peoria, Atlanta, and Florida, and Summers tried to follow up with each of those locations.

Anthony Seldun testified that he was employed with law enforcement. In early 2004, defendant told Seldun that he lived at 404 Prospect Terrace in Freeport. Seldun visited him there on March 19, 2004, as well as several prior occasions. There was never a time up to that date that Seldun was unable to contact defendant. However, after April 20, 2004, Seldun was not able to find or contact defendant at the Prospect Terrace address; he did not see or hear from defendant for over one year after that.

Brice Lambrecht of the Rockford police department testified that on September 23, 2005, at about 9:30 p.m., he received a dispatch about a car accident. Defendant was one of the drivers and appeared to be extremely intoxicated. Defendant told Lambrecht that his name was Patrick Clark and that he was born in December 1980. The dispatch center informed Lambrecht that someone with that name and birth date had surrendered his driver's license to the State of Georgia; the individual had similar physical characteristics to

defendant. Over one hour later, Lambrecht obtained information from another source about defendant's real identity.

The parties stipulated that the sandwich bags found in the Cadillac were determined to each contain 60.2 grams of cocaine, for a total of 120.4 grams of cocaine.

The jury found defendant guilty of unlawful possession with intent to deliver cocaine. The trial court denied defendant's motion for a new trial and his subsequent motion to reconsider his sentence. Defendant timely appealed.

## II. ANALYSIS

### A. Motions to Suppress

Defendant first argues that the statements he made at the time of the stop should have been suppressed. When reviewing a ruling on a motion to suppress, we defer to the trial court's factual findings and reverse those findings only if they are against the manifest weight of the evidence. *People v. Harris*, 228 Ill. 2d 222, 230 (2008). Such deference is based on the recognition that the trial court is in a superior position to determine and weigh the witnesses' credibility, observe their demeanor, and resolve conflicts in their testimony. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). However, we review *de novo* the ultimate ruling on the motion to suppress. *Harris*, 228 Ill. 2d at 230. Moreover, in reviewing the trial court's ruling on a motion to suppress, we may consider the entire record, including trial testimony. *People v. Alfaro*, 386 Ill. App. 3d 271, 290 (2008).

The United States and Illinois Constitutions give citizens the right to be secure against unreasonable searches and seizures. U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, §6. Encounters between the police and citizens are divided into three tiers: (1) arrests, which require probable cause; (2) brief investigative stops, also known as *"Terry"* stops, which require a reasonable, articulable suspicion of criminal activity; and (3) consensual encounters, which do not involve coercion or detention and therefore do not implicate the fourth amendment. *People v. Luedemann*, 222 Ill. 2d 530, 544 (2006).[1]

Expanding on the second category, a person is seized for fourth amendment purposes "when, by means of physical force or a show of authority, the person's freedom of movement is restrained." *People v.*

---

[1] In *Luedemann*, our supreme court clarified that consensual encounters do not include the " 'community caretaking' doctrine," which is "invoked to validate a search or seizure as reasonable under the fourth amendment" and "is not relevant to determining whether police conduct amounted to a seizure in the first place." *Luedemann*, 222 Ill. 2d at 548.

*Cosby*, 231 Ill. 2d 262, 273 (2008). "[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439, 115 L. Ed. 2d 389, 401-02, 111 S. Ct. 2382, 2389 (1991). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554, 64 L. Ed. 2d 487, 509, 100 S. Ct. 1870, 1877 (1980). Not all police questioning involves a seizure (*People v. Richardson*, 376 Ill. App. 3d 612, 617-18 (2007)), even if the police ask more than one question (*Richardson*, 376 Ill. App. 3d at 619). An encounter remains consensual if a reasonable person would feel free to decline the officer's requests and terminate the encounter. *People v. Ocampo*, 377 Ill. App. 3d 150, 156 (2007).

In this case, it is undisputed that the police had probable cause to stop the vehicle, based on its improper registration. A vehicle's passenger is seized for fourth amendment purposes when the vehicle is subjected to a traffic stop. *Brendlin v. California*, 551 U.S. 249, 255, 168 L. Ed. 2d 132, 138-39, 127 S. Ct. 2400, 2406 (2007); *Harris*, 228 Ill. 2d at 231. Defendant does not dispute the propriety of the initial pat-down search for officer safety, and we note that nothing was found on his person. While defendant was clearly "seized" up to this moment, Summers then told defendant that he was free to leave but that the vehicle had to remain at the scene. Summers did not tell defendant where to go other than to just stand away from the vehicle.

In determining whether defendant was still seized after Summers told him he could leave, we apply the *Mendenhall* factors. See *Cosby*, 231 Ill. 2d at 277-78; *Ocampo*, 377 Ill. App. 3d at 157. Regarding the first *Mendenhall* factor, the threatening presence of several officers, defendant points out that there were three officers at the scene and argues that the videotape shows that, most of the time, one, if not all three, was standing right next to him. However, the videotape also indicates that defendant was alone at various times and that he did not remain standing in the same place the entire time. The second factor, the display of a weapon, did not occur in this case. See *Cosby*, 231 Ill. 2d at 287 (the mere fact that police officers carry guns does not mean they have displayed their weapons under *Mendenhall*). For the

third factor, physical touching, defendant notes that he was patted down twice during the stop. One of the pat-downs was when defendant exited the car, and he consented to the second pat-down for drugs.

For the fourth factor, the use of language or tone of voice indicating that compliance with the officer's request might be compelled, defendant argues that Summers threatened defendant that Walker could go to prison for a very long time unless defendant helped her. However, defendant did not directly respond to Summers' statement, indicating that he did not think he was required to immediately divulge information. Rather, he asked Summers if he could talk to him the next day. Additionally, after Summers told him that Walker had given her permission to search the car, defendant yelled at Walker not to allow the search, further demonstrating that he did not feel unable to decline the officers' requests. *Cf. Cosby*, 231 Ill. 2d at 287 (the defendant's refusal of the officer's request to search the car showed that he did not feel the need to comply with that request). We further note that, after the search was terminated, defendant asked Summers if he could ask him something, at which point Summers again informed defendant that he was free to leave and that Summers would talk to him only about the "case that was going on." Defendant asked if someone had told on him, and Summers asked defendant if he wanted to talk about the drugs that were going to be found in the car. Defendant declined, once more showing that he did not feel compelled to answer Summers' questions. Finally, we note that defendant and Walker called for a ride and eventually left on their own accord before the tow truck arrived.

Defendant argues that the police took at least 30 minutes to issue Walker a traffic citation and that Summers' interrogation and two searches of him unlawfully prolonged the encounter beyond the time reasonably required for issuing a ticket. See *People v. Salinas*, 383 Ill. App. 3d 481, 496 (2008) (a lawful seizure may become unlawful if the police unreasonably prolong a traffic stop). However, Summers testified that, after Marti advised Walker that she would be receiving a ticket, Summers told her that she was free to leave but that the car would have to remain at the scene. At trial, Summers clarified that, while a person must usually wait for the ticket before he or she has permission to leave, here, due to his belief that there were drugs in the car, he told Walker that she was free to leave and that the police would get the ticket to her later. Summers also offered to let Walker sit in the back of the police car, and Walker chose this option. Thus, although it may have been half an hour before the police issued the ticket, the police did not prolong the encounter. Moreover, Summers told defendant himself on two occasions, the first one being shortly after he exited the Cadillac, that he was free to leave.

We recognize that simply telling someone he or she is free to leave does not automatically make an encounter consensual, but it is still "certainly a relevant consideration." *People v. Goeking*, 335 Ill. App. 3d 321, 324 (2002). Defendant argues that, as a practical matter, there was nowhere for him to go because he and Walker were stopped late at night on a busy highway with no sidewalks or buildings. Defendant argues that he was stuck at the scene until he could arrange for someone to pick him up and that there was no evidence that he or Walker could have used a cell phone at any given time after the initial stop. However, while Summers testified that he did not think that defendant had a cell phone on his person, he also testified that defendant asked him to get his keys out of the car, which Summers did. If defendant had a cell phone in the car, he could have just as easily asked Summers to get it. Summers also testified that, after Walker was given her ticket, she and defendant "chose to walk a short distance away and make a phone call to have someone come pick them up," and someone called defendant on his cell phone and picked him up. Thus, the testimony indicates that defendant and Walker did have access to a cell phone. Furthermore, the question is not whether the defendant "practically and realistically" felt free to walk away but, rather, whether the police conduct "curtailed the defendant's liberty through physical force or a show of authority." *Luedemann*, 222 Ill. 2d at 555-56.

 Here, even if defendant did not have immediate access to a ride to leave the scene, a reasonable person in the same circumstances still would have felt free to decline the officers' requests. In addition to being told he could leave more than once, defendant chose not to respond to some of the officers' statements/questions, and he further advised Walker to revoke her consent to search the car, demonstrating that defendant himself felt free to decline the officers' requests. Considering the *Mendenhall* factors as well as the other circumstances in the case, we conclude that defendant was not seized when he made the incriminating statements and that the trial court properly denied his motions to suppress.

Based on our conclusion that defendant's encounter with the police was consensual, rather than a seizure, when he made the incriminating statements, we do not address whether the informant's tip provided reasonable suspicion to stop defendant.

### B. Admissibility of Evidence

Defendant next argues that he was denied his due process right to a fair trial when the trial court allowed: Summers' testimony that he told defendant he had reason to believe defendant was transporting

drugs from Rockford to Freeport; irrelevant testimony about controlled drug buys; and highly prejudicial evidence about defendant's criminal history and prior contacts with a law enforcement official. Evidentiary rulings are within the trial court's discretion and will not be reversed absent a clear abuse of discretion. *People v. Wheeler*, 226 Ill. 2d 92, 132 (2007).

■ Regarding the first evidentiary issue, Summers testified at trial that, during the traffic stop, he told defendant that he "had reason to believe that [defendant] was transporting drugs back from Rockford to Freeport." This statement also came up in response to questioning at two other times during the trial. Defendant had previously sought to bar such testimony through his motion *in limine*, but the trial court denied that portion of the motion, reasoning, among other things, that the testimony was relevant to the State's theory of flight.

Hearsay is an out-of-court statement offered to establish the truth of the matter asserted, and it is generally not admissible unless an exception applies. *People v. Cox*, 377 Ill. App. 3d 690, 700 (2007). For example, "[i]nadmissible hearsay exists where a third party testifies to [the] statements made to him by another nontestifying party that identify the accused as the perpetrator of a crime." *Cox*, 377 Ill. App. 3d at 700. Conversely, if testimony of an out-of-court statement is offered for the limited purpose of explaining why the police conducted their investigation in the manner that they did, rather than for the truth of the matter asserted, the testimony is not barred as hearsay. *Cox*, 377 Ill. App. 3d at 701-02. Such testimony is allowed where it is necessary to fully explain the State's case to the trier of fact. *People v. Peoples*, 377 Ill. App. 3d 978, 984 (2007). The testimony should be limited to showing how the officer conducted the investigation and should not put the substance of out-of-court conversations into evidence to show the truth of the matter asserted. *People v. Feazell*, 386 Ill. App. 3d 55, 65 (2007). Still, "[t]estimony describing the progress of [an] investigation is admissible even if it suggests that a nontestifying witness implicated the defendant." *People v. Simms*, 143 Ill. 2d 154, 174 (1991). Alternatively, testimony regarding an out-of-court statement is admissible to show its effect on the listener's mind or explain the listener's subsequent actions. *Feazell*, 386 Ill. App. 3d at 66.

Defendant argues that Summers' testimony was not offered to show his investigative steps of talking to the informant and then deciding to stop defendant, but rather the testimony "put the substance of the informant's conversation with him squarely before the jury." In this way, argues defendant, the testimony had the effect of proving the truth of the matter asserted, that defendant was transporting drugs from Rockford to Freeport.

We disagree. Summers' statement, that he "had reason to believe that [defendant] was transporting drugs back from Rockford to Freeport," did not reveal the source of the belief, *i.e.* whether it came by way of an informant or other means, such as personal observation, so the testimony could not even be shown to directly link to an out-of-court statement. Furthermore, the testimony was offered to explain why the police conducted their investigation in the manner that they did and was necessary to fully explain the State's case. Otherwise, there was no explanation as to why the police were following the Cadillac, why they did not stop it until it returned to Freeport, why they told defendant and Walker they were free to leave but the car would have to stay, why they asked to search the vehicle, and why they decided to get a search warrant and have the car towed. See *Cox*, 377 Ill. App. 3d at 702 (part of the rationale for the police investigation exception is that an officer should be allowed to give some explanation of his presence and conduct); *cf. People v. Bell*, 343 Ill. App. 3d 110, 113-14 (2003) (officer's testimony that police had received complaints of narcotics sales with a description of the seller and the car was not inadmissible hearsay). Defendant argues that the testimony was unnecessary because the fact that the police later found drugs in the car would have allowed the jury to understand why the police seized the car. However, limiting the testimony to the fact that the police ultimately found drugs in the car would not have allowed Summers to explain in a logical, comprehensive manner why he investigated the case in the way that he did. Also, without Summers' testimony that he originally thought there were drugs in the car, that the police ultimately found drugs in the car could have been purely coincidental.

Moreover, the disputed statement was also offered to show its effect on defendant, as evidence of consciousness of guilt. Specifically, after hearing the statement, defendant asked who had told on him, told Walker not to let the police search the car, could not be found for over one year, and gave the police a false name when he was arrested. Defendant argues that, even if the testimony was relevant in this manner, it was more prejudicial than probative because it went to the very essence of the dispute of whether he possessed the drugs with the intent to deliver them. See *People v. Warlick*, 302 Ill. App. 3d 595, 600 (1998) (when out-of-court statements regarding the police investigation go to the essence of the dispute, they should not be admitted). This case is distinguishable from *Warlick* because, as stated, the disputed testimony was not even shown to be linked to an out-of-court statement. Furthermore, in *Warlick* the court determined that the statement had little or no relevance and was not necessary to explain the police investigation (*Warlick*, 302 Ill. App. 3d at 600), contrary to

our analysis in this case. Finally, the *Warlick* analysis related to police investigative procedures and not the statement's effect on the listener, as in this portion of our analysis. In sum, the trial court did not abuse its discretion by allowing Summers' testimony that he had reason to believe that defendant was transporting drugs from Rockford to Freeport.

Defendant further argues that the prosecution did not limit the use of the testimony to a nonhearsay purpose but rather ensured that the jury would use it as proof against him. Defendant notes that the prosecutor stated in closing argument, "Officer Summers arrived at the scene and told [defendant], 'I have reason to believe that you are transporting drugs from Rockford to Freeport.' He told him that at the beginning. So [defendant] knew that was what Officer Summers and the police officers were there for." However, the prosecutor made this remark in the context of explaining what defendant was referring to when he asked if someone told on him. So used, Summers' statement was relevant to show defendant's consciousness of guilt and was not hearsay.

Defendant also points out that, in rebuttal closing argument, the prosecutor stated:

"If you believe what he [Summers] said, there is no question what happened here. There is no question. Now, what is the first thing he said when he stopped [defendant][?] The first thing he says is we have reason to believe you are transporting drugs from Rockford to Freeport."

However, again, the prosecutor made this remark in the context of arguing that defendant's question about who told on him showed his knowledge of the drugs rather than, as defense counsel had argued in closing, his belief that Walker or someone else was falsely implicating him for transporting drugs. The prosecutor also tied his remark to the fact that defendant was missing for about $1^1/2$ years after the stop, which was also proper to show defendant's consciousness of guilt. Accordingly, the State did not use Summers' statement as hearsay during closing argument.

█ Defendant next argues that the trial court abused its discretion in allowing Summers' testimony regarding controlled drug buys, which defendant argues was extensive and went beyond merely offering a foundation for his opinion that the amount of drugs found in the Cadillac showed an intent to deliver. On this issue, Summers testified as follows. He was with the street crimes unit for about $1^1/2$ years. The unit mostly dealt with the sale of drugs within Freeport. In investigating cases, the police worked with confidential informants or undercover officers from outside Freeport. The informants were sometimes used

to purchase drugs in controlled buys because the Freeport officers were known to a lot of the Freeport drug dealers. The police would search the informants, provide them with money to purchase drugs, conduct surveillance on them, and then search them again for anything they may have purchased. In some situations, such as if the informant was not willing to testify against the dealer, the police would obtain a search warrant to see if there were other drugs in the dealer's house. Summers had participated both in controlled drug buys and in the execution of search warrants. He then discussed the amount of drugs typically purchased in controlled buys.

Police officers with narcotics experience may be qualified as experts in the field. *People v. Foules*, 258 Ill. App. 3d 645, 660 (1993). As defendant recognizes, these officers may testify regarding the differences between drug users and drug dealers in order to help the jury determine the element of intent to deliver. See *People v. King*, 218 Ill. App. 3d 248, 253 (1991). However, profile testimony describing common practices, habits, or characteristics that are not in any way connected to the defendant or his circumstances should be excluded. *People v. Brown*, 232 Ill. App. 3d 885, 898 (1992) (where officer's testimony was offered to show the street value of the drugs recovered from the defendant, it was error to allow him to offer general profile testimony of drug sellers).

Here, we agree with the State that Summers' testimony regarding controlled drug buys was relevant to establish a foundation for Summers' subsequent testimony regarding the quantity of drugs that users possess as compared to dealers. We disagree with defendant's characterization of it as overly "extensive." Also, unlike in *Brown*, it did not constitute general profile testimony and was relevant to Summers' ultimate opinion that defendant possessed the drugs with intent to deliver. Defendant argues that the testimony was highly prejudicial because it created a false inference that he was involved in a controlled drug buy and that the search warrant eventually executed was the result of the buy. This argument lacks merit, as the State relied on the quantity of the drugs to establish an intent to deliver, and the testimony regarding controlled buys was clearly presented as just a foundation for Summers' knowledge of the quantity of drugs a user typically possesses versus a seller. Accordingly, it was not an abuse of discretion for the trial court to allow the testimony into evidence.

■ Defendant next argues that it was error for the trial court to allow testimony from Summers that he had provided Rockford detectives with defendant's "criminal history" in an attempt to locate defendant. Defendant also argues that it was error to allow Seldun, his parole officer, to testify that he was in "law enforcement" and had

previous contact with defendant. Defendant argues that the testimony conveyed to the jury that he had a prior criminal record, and it was highly prejudicial because it could have convinced the jury to convict him based on a propensity to commit crime rather than on the facts of the case.

Evidence of other crimes is not admissible if it is relevant only to show the defendant's propensity to commit crime. *People v. Cortes*, 181 Ill. 2d 249, 282 (1998). Evidence of other crimes may be admitted to show identity, absence of mistake, a defendant's state of mind, the circumstances of his arrest (*People v. Pursley*, 284 Ill. App. 3d 597, 606 (1996)), or a fact material to the prosecution (*Cortes*, 181 Ill. 2d at 283). Also, a defendant's flight may be offered as evidence of his guilt. *People v. Newborn*, 379 Ill. App. 3d 240, 247 (2008). Still, the trial court must weigh the relevance of the evidence against its potentially prejudicial effect. *Cortes*, 181 Ill. 2d at 284.

We note that defendant did not object to Summers' statement about his criminal history, thereby forfeiting the issue for review. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for review, the defendant must object at trial and raise the issue in a written posttrial motion). However, defendant asks that we review the issue for plain error. The plain-error doctrine allows a reviewing court to consider an unpreserved error where either (1) a clear error occurs and the evidence is closely balanced, or (2) a clear error occurs that is so serious that it affected the fairness of the trial and challenged the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007).

In applying the plain-error test, the first step is to determine whether error occurred at all. See *Piatkowski*, 225 Ill. 2d at 565. We agree that Summers' reference to defendant's criminal history was improper; it was not necessary or very relevant in describing Summers' search for defendant, so its potentially prejudicial impact outweighed any probative value. However, we also conclude that the error does not satisfy either prong of the plain-error test. First, the evidence was not closely balanced, in that: (1) the evidence showed that the cocaine was found in a car to which defendant had strong ties, in that he was riding in it when the drugs were found and documents with his name were found in various parts of the car, including an oil change receipt for the same car; (2) the drugs were in close proximity to him at the time of the stop; (3) defendant made several inculpatory statements at the time of the stop, including asking if someone had told on him and telling Walker not to let the officers search the car; and (4) the police could not find defendant for about 1½ years after the incident, and, when he was found, he gave a false

name, showing flight and consciousness of guilt. We also conclude that the error was not so serious as to affect the trial's fairness, because Summers' reference to defendant's criminal history was made in passing and in conjunction with the fact that he was wanted in the current case. Also, the jury was informed that defendant's eventual arrest came while he was being investigated in connection with a traffic accident, and he gave a false name to the police, which, while properly admissible, also could indicate other possible crimes. Thus, Summers' brief reference to defendant's criminal history does not constitute reversible error.

Seldun's testimony consisted of stating that he was employed by law enforcement and had visited defendant at a particular address in March 2004 as well as on other occasions. Seldun testified that, up until that time, he was always able to contact defendant, but after April 20, 2004, he was not able to find defendant. We conclude that the trial court did not abuse its discretion by allowing this testimony. Although Summers also testified regarding his efforts to find defendant, his testimony did not indicate that defendant's absence from the Freeport area was unusual. In contrast, Seldun provided more specific evidence that defendant was living in and able to be contacted in Freeport on a consistent basis before the traffic stop but not soon afterwards, which is much stronger evidence of flight. Notably, Seldun did not reveal that defendant was on parole, and someone employed by "law enforcement" could be in repeated contact with an individual for a number of reasons, such as if the individual was an informant, witness, or crime victim.

## C. Rebuttal Closing Argument

Defendant further argues that he is entitled to a new trial due to the cumulative effect of improper and prejudicial remarks that the State made in its rebuttal closing argument. A prosecutor generally has wide latitude in closing arguments and may comment on the evidence and any reasonable inferences arising from the evidence, even if the inferences reflect negatively on the defendant. *People v. Perry*, 224 Ill. 2d 312, 347 (2007). We consider statements in the context of the closing arguments as a whole instead of examining the contested phrases in a vacuum. *Perry*, 224 Ill. 2d at 347. If we determine that the jury could have reached the opposite verdict absent the improper remarks, or we cannot determine that the improper remarks did not contribute to the defendant's conviction, we will grant a new trial. *Wheeler*, 226 Ill. 2d at 123.

We note that the First District recently stated that there is a conflict as to whether to review allegedly improper comments in clos-

ing arguments under an abuse-of-discretion or *de novo* standard of review. See *People v. Johnson*, 385 Ill. App. 3d 585, 603 (2008). The *Johnson* court pointed out that a long line of supreme court cases stated that, because the trial court is in the best position to evaluate any prejudicial effect of remarks in closing argument, reviewing courts apply an abuse-of-discretion standard to such rulings. *Johnson*, 385 Ill. App. 3d at 603. The *Johnson* court then noted that, in the 2007 *Wheeler* case, the supreme court stated that whether a prosecutor's statements in closing argument were so egregious as to warrant a new trial is a legal issue we review *de novo*. *Johnson*, 385 Ill. App. 3d at 603, citing *Wheeler*, 226 Ill. 2d at 121. Arguably, the supreme court may have intended that we review the propriety of rulings on individual remarks under an abuse-of-discretion standard while we review the cumulative effect of all of the improper remarks under a *de novo* standard. In any event, like the *Johnson* court, we leave the resolution of this issue to another day, as our conclusion would be the same applying either standard. See *Johnson*, 385 Ill. App. 3d 585.

Defendant recognizes that his counsel objected to only one of the remarks to which he now complains, thereby forfeiting the remainder for review. However, he asks that we review the remarks for plain error. As stated, the first step of the plain-error test is to determine whether any error occurred in the first place. See *Piatkowski*, 225 Ill. 2d at 565.

■ Defendant first argues that the prosecutor derided defense counsel and his theory of the case by stating that: the defense "hasn't even decided what their defense is yet"; defense counsel's explanation for defendant's question of whether someone told on him was "a story," "a ridiculous statement," and "so ridiculous nobody could believe that"; the examples the defense provided to explain the case were also "ridiculous"; the defense's highlighting the lack of DNA and fingerprint evidence was "tak[ing] you 12 people and send[ing] you off to some kind of fairy tale land and think about all these things that don't make any difference"; and defense counsel's argument about the lack of cash, scales, or other indications of intent to deliver in the car was "a typical example of trying to divert your attention from what the evidence is to what was proven."

We find no error in the above-mentioned remarks. While a prosecutor may not claim that defense counsel has deliberately lied to the jury or fabricated a defense, a prosecutor may challenge a defendant's credibility and the credibility of his defense theory (*People v. Ligon*, 365 Ill. App. 3d 109, 124 (2006)), as well as the persuasiveness of the defense (*People v. Love*, 377 Ill. App. 3d 306, 314 (2007)). This includes referring to the defense theory as "ridiculous." See *Ligon*, 365 Ill.

App. 3d at 124. Indeed, numerous cases have upheld the use of the term "ridiculous" in closing arguments as acceptable commentary on the defense theory or the defendant's testimony. See, *e.g.*, *People v. Zoph*, 381 Ill. App. 3d 435, 454 (2008) (no error to call defendant's theory of the case " 'wacky' " or the defendant's testimony " 'preposterous, silly and ridiculous' "); *People v. Maldonado*, 240 Ill. App. 3d 470, 483-84 (1992) (no error for prosecutor to characterize defense theory as " 'ridiculous' "); *People v. Dent*, 230 Ill. App. 3d 238, 245-46 (1992) (same); *People v. Larry*, 218 Ill. App. 3d 658, 663-64 (1991) (same). Similarly, referring to the defendant's argument about the lack of DNA and fingerprint evidence as akin to a "fairy tale" was also an acceptable comment on the persuasiveness of the defense theory. Notably, the State properly confined itself to commenting on the defense theory rather than on defense counsel personally. See *People v. Baugh*, 358 Ill. App. 3d 718, 743 (2005) (not improper to refer to the defense theory as a " 'joke' "; the prosecutor did not personally attack defense counsel, question his integrity, or call him a liar).

Defendant further argues that the prosecutor improperly shifted the burden of proof when he stated, "He hasn't quite explained that year and a half absence. How much did he talk about that? Not much. He is from Freeport. Where was he for a year and a half?" Defendant also argues that, after defense counsel legitimately argued that the State had not presented scientific evidence connecting him to the possession of the drugs, the prosecutor improperly responded, "If there was something that excluded him, I am certain it would be in front of you but there isn't."

The State always has the burden of proving, beyond a reasonable doubt, the elements of the crime, and it is improper for the State to suggest that it has no burden of proof or to attempt to shift the burden of proof to the defendant. *People v. Nowicki*, 385 Ill. App. 3d 53, 90 (2008). However, if defense counsel's closing argument provokes a response, the defendant cannot complain that the State's reply in rebuttal argument denied him a fair trial. *People v. Swart*, 369 Ill. App. 3d 614, 637 (2006). Accordingly, after defense counsel discussed the lack of scientific evidence in his closing argument, it was not improper for the State to argue that defendant could have produced such evidence. *Cf. Nowicki*, 385 Ill. App. 3d at 91 (proper for prosecutor to point out that the defendant could have subpoenaed police officers, in response to the defense's highlighting that the State had not called officers as witnesses); *Baugh*, 358 Ill. App. 3d at 741-42 (prosecutor's argument that the defendant could have produced telephone records was not improper where defense counsel had argued

that the State could have produced such records but had chosen not to). Similarly, defense counsel argued in closing that, even though defendant was involved in an alcohol-related incident 1½ years later and gave a false name, he was not on trial for that incident and it did not prove that he possessed drugs 1½ years before. Therefore, it was not improper for the State to respond to this argument by stating that the 1½-year gap was relevant because defendant could not be found in his hometown of Freeport and defense counsel's argument did not include an explanation for where he was during that time.

Last, defendant argues that the State improperly referred to Walker's age, thereby appealing to the prejudices of the jury and attempting to distract it from the contested issues at trial. Defendant points out that the prosecutor stated, "This [defendant] was 29 years old. He had an 18 year old girl in there." Defense counsel objected on the basis that defendant's age was not in evidence, and the trial court sustained the objection. By objecting at trial and citing this statement in his motion for a new trial, defendant preserved the issue for review, unlike the other comments discussed here. See *Enoch*, 122 Ill. 2d at 186. Sustaining an objection is generally sufficient to cure any prejudice (*Wheeler*, 226 Ill. 2d at 128), and that is the case here, whether considered under either an abuse-of-discretion or *de novo* standard of review. Defendant argues that the prosecutor then improperly stated, "An 18 year old girl, this guy is blaming some 18 year old girl for what he did." Walker's age was brought out through Summers' testimony, and the defense theory was that the drugs in the car belonged to Walker, not defendant. Thus, to say that defendant was blaming 18-year-old Walker was not improper commentary.

As there was no error in the individual complained-of remarks, it follows that the cumulative effect of the remarks was not prejudicial. See *People v. Simmons*, 342 Ill. App. 3d 185, 191 (2003).

### D. Sentence

■ Defendant next argues that, during sentencing, the trial court improperly considered in aggravation factors inherent in the offense of which he was convicted. Specifically, defendant argues that the trial court should not have considered the widespread societal harm caused by his conduct and the compensation that he would have received for his conduct. A trial court may not use a factor implicit in the offense as an aggravating factor in sentencing. *People v. Csaszar*, 375 Ill. App. 3d 929, 951 (2007). At the same time, however, a trial court may consider the nature and circumstances of the offense, including the nature and extent of each element of the crime that the defendant committed. *People v. Saldivar*, 113 Ill. 2d 256, 268-69 (1986). A trial

court's sentencing decision is presumed to be legally correct, and we will not disturb it absent an abuse of discretion. *Cox*, 377 Ill. App. 3d at 709. However, consideration of an improper factor can be an independent basis for reversal. *People v. Burnette*, 325 Ill. App. 3d 792, 809 (2001). Defendant did not raise the inherent-factors issue in his postsentencing motion, but he asks that we review it for plain error.

At the sentencing hearing, the State argued, among other things, that the defendant had "125 grams [*sic*]" of cocaine, and, if it were sold in one-quarter-gram increments, that would mean 500 transactions and 500 "people in Freeport developing or aggravating a cocaine habit." The State argued that the cocaine trade caused very serious harm and that defendant's actions threatened very serious harm. Defense counsel argued that the "severity of the offense is already certainly contemplated by the legislature." The trial court then went through the sentencing factors in mitigation under section 5—5—3.1 of the Unified Code of Corrections (730 ILCS 5/5—5—3.1 (West 2004)). It stated that the factor that the conduct did not cause or threaten harm did not apply, because defendant was convicted of possession with intent to deliver a large amount of drugs, and, even given half of the figures the State presented, defendant would have made over 200 sales of cocaine. The trial court next went through the aggravating factors listed in section 5—5—3.2 of the Unified Code of Corrections (730 ILCS 5/5—5—3.2 (West 2004)). With regard to the factor of the conduct causing or threatening serious harm, the trial court stated that it had already addressed it when discussing possible mitigating factors. For the aggravating factor of receiving compensation for committing the offense, the trial court stated that "certainly by inference possession with intent to deliver would anticipate receiving compensation."

In announcing defendant's sentence, the trial court stated:

"In this case, the Court in reiterating that the minimum is nine years ***, the maximum is forty years, given the defendant's substantial prior record and especially consider [*sic*] he had a Class 1 felony in 1999 for a similar offense ***.

The Court believes in this case that a sentence of twenty-five years to the Department of Corrections is appropriate. *** I don't believe that a minimum sentence of ten or eleven years is appropriate. I also have to consider deterring other people from similar crimes. *** Given the prior record that you have for a similar offense and the prior substantial criminal record that you have, the Court does believe that the twenty-five year sentence is appropriate under the circumstances."

While we agree with defendant that the potential danger to society from the amount of the drugs is inherent in the crime of possession with intent to deliver (see *People v. Corn*, 358 Ill. App. 3d 825, 827-28 (2005)), in this case the trial court merely commented on the specific degree of harm threatened by defendant's actions, *i.e.*, how many sales he might have generated, rather than focusing on the general harm to society. As our supreme court has stated:

"[T]he commission of any offense, regardless of whether the offense itself deals with harm, can have varying degrees of harm or threatened harm. The legislature clearly and unequivocally intended that this varying quantum of harm may constitute an aggravating factor. While the classification of a crime determines the sentencing range, the severity of the sentence depends upon the *degree of harm* caused to the victim and as such may be considered as an aggravating factor in determining the exact length of a particular sentence." (Emphasis in original.) *Saldivar*, 113 Ill. 2d at 269.

See also *People v. Alcala*, 248 Ill. App. 3d 411, 425-26 (1993) (court can consider amount of drugs in excess of minimum for sentencing range and its potential impact on society); *People v. McCain*, 248 Ill. App. 3d 844, 852 (1993) ("not improper *per se* for a sentencing court to refer to the significant harm inflicted upon society by drug trafficking").

Receiving compensation is also inherent in drug-delivery offenses (*People v. M.I.D.*, 324 Ill. App. 3d 156, 159 (2001)), but the trial court recognized this in stating that "by inference possession with intent to deliver would anticipate receiving compensation." To the extent there was any error in referring to the factor, the error was harmless because the trial court merely commented on it in passing while going down the list of statutorily aggravating factors. *Cf. People v. Burge*, 254 Ill. App. 3d 85, 91 (1993).

Significantly, the report of proceedings shows that, in ultimately sentencing defendant, the trial court primarily considered that he had a previous conviction of a similar offense, he had a long criminal record, and there was a need to deter others. Accordingly, we conclude that the trial court did not improperly rely on any factors inherent in the offense when sentencing him to 25 years' imprisonment.

### E. Monetary Credit

■ Last, defendant argues that he is entitled to monetary credit against his fines for the time he was incarcerated before sentencing. We agree. Section 110—14 of the Code of Criminal Procedure of 1963 (725 ILCS 5/110—14 (West 2004)) provides for a $5-per-day credit for any person who is incarcerated on a bailable offense but does not pay bail. The credit applies from the time the defendant is in pretrial

custody up to the time of sentencing. *People v. Rivera*, 378 Ill. App. 3d 896, 899 (2008). Any portion of a day spent in custody is counted as a full day for the purposes of this credit. *People v. Stahr*, 255 Ill. App. 3d 624, 627 (1994). The record reflects that defendant was in custody for 392 days before sentencing, entitling him to $1,960 in credit against his fines.

## III. CONCLUSION

Pursuant to our authority under Supreme Court Rule 615(b) (134 Ill. 2d R. 615(b)), we modify defendant's sentencing order to reflect a monetary credit of $1,960 against his fines. We affirm the judgment of the Stephenson County circuit court in all other respects.

Affirmed as modified.

SCHOSTOK, J., concurs.

JUSTICE O'MALLEY, specially concurring:

I write separately to explain why I believe that *People v. Luedemann*, 222 Ill. 2d 530 (2006), effectively created a fourth tier of police-citizen encounters known as community caretaking seizures. I say "effectively" because, though the court in *Luedemann* recognized that police may seize persons for community caretaking or public safety reasons, the court did not expressly alter the three-tier structure inherited from *People v. Murray*, 137 Ill. 2d 382, 387-88 (1990). In fact, the court seemed positively against any such revision. First, the court said:

> " 'Community caretaking,' *rather than describing a tier of police-citizen encounter*, refers to a capacity in which the police act when they are performing some task unrelated to the investigation of crime." (Emphasis added.) *Luedemann*, 222 Ill. 2d at 545.

And later, after setting forth the *Murray* tiers *and* recognizing as valid the concept of a community caretaking seizure, the court launched its analysis by stating: "Having properly set forth the *three* tiers of police-citizen encounters, we next consider the nature of the encounter when Officer Pate approached defendant's vehicle." (Emphasis added.) *Luedemann*, 222 Ill. 2d at 550.

On the other hand, there are these remarks from the court: "Courts use the term 'community caretaking' to *uphold searches or seizures* as reasonable under the fourth amendment when police are performing some function other than investigating the violation of a criminal statute." (Emphasis added.) *Luedemann*, 222 Ill. 2d at 546. "It is clear, then, that the 'community caretaking' doctrine is analytically distinct from consensual encounters *and is invoked to validate a*

*search or seizure as reasonable under the fourth amendment."* (Emphasis added.) *Luedemann*, 222 Ill. 2d at 548.

How a seizure occurring in a community caretaking context could not be a "police-citizen encounter" is beyond my ken. I can only speculate as to why the supreme court in *Luedemann* did not formally expand the *Murray* taxonomy to accommodate such encounters. Perhaps it was because the *Murray* tiers are each keyed to the quantum of justification needed for the encounter, and the court in *Luedemann* was not called on to articulate the criteria for a community caretaking seizure.[2] Whatever the case, I believe that formal embedment of the community caretaking doctrine in the *Murray* tiers is necessary to ensure that the doctrine—of comparatively recent vintage—becomes ingrained in the consciousness of Illinois practitioners and courts. I say this because several published decisions since *Luedemann* have recited the three *Murray* tiers without acknowledging that they do not exhaust all police-citizen encounters under the fourth amendment, because not all coercive police action need be justified as involving "the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute" (*Cady v. Dombrowski*, 413 U.S. 433, 441, 37 L. Ed. 2d 706, 714-15, 93 S. Ct. 2523, 2528 (1973)). See *People v. Roa*, 377 Ill. App. 3d 190, 196 (2007), *vacated on other grounds*, 229 Ill. 2d 687 (2008); *In re Mario T.*, 376 Ill. App. 3d 468, 471 (2007). I also am one for whom an old habit dies hard. See *People v. Flores*, 371 Ill. App. 3d 212, 219-20 (2007) (O'Malley, J.), and I commend the majority for recognizing the community caretaking doctrine here. The doctrine is not the odd man of search and seizure law; its credentials are as solid as those of *Terry* (see *People v. Cordero*, 358 Ill. App. 3d 121, 127-28 (2005) (O'Malley, P.J., specially concurring)) and it must be integrated into our fourth amendment "boilerplate" alongside *Terry*.

---

[2]As I have previously written, community caretaking searches or seizures are best evaluated under a balancing test. See *People v. Cordero*, 358 Ill. App. 3d 121, 134-35 (2005) (O'Malley, P.J., specially concurring).